THE CALORIZING COMPANY, PETITIONER, *v.* HENRY L. STIMSON, SECRETARY OF WAR OF THE UNITED STATES, ROBERT P. PATTERSON, UNDER SECRETARY OF WAR OF THE UNITED STATES, RESPONDENTS.

Docket No. 227-R.   Promulgated August 19, 1946.

*Wallace C. Magathan, Esq.*, for the petitioner.
*Frederick N. Curley, Esq.*, for the respondents.

OPINION.

TURNER, *Judge*: The Secretary of War made a unilateral determination that $100,000 of the profits realized by the petitioner from its renegotiable business during its fiscal year ended April 30, 1943, constituted excessive profits within the meaning of the Renegotiation Act. The statutory notice of this determination, dated March 30, 1945, was mailed to and received by petitioner. The present proceeding is brought to determine the correctness of that determination. The petitioner has now moved, however, that the Court enter an order that the petitioner has no liability for excessive profits for the fiscal year involved, and states as its ground therefor that the determination is barred by the statute of limitations made and provided by section 403 (c) (5) of the Renegotiation Act of 1942.[1]

The petitioner is a Delaware corporation, with its principal office in Wilkinsburg, Pennsylvania. On March 14, 1944, a member of the Pittsburgh Ordnance District Price Adjustment Board, hereinafter referred to as the District Board, telephoned the petitioner's president, advising that petitioner had been assigned to the District Board for renegotiation of its renegotiable business for the fiscal year ended April 30, 1943, and making arrangements for a meeting to be held by

---

[1] SEC. 403 (c) (5). Any contractor or subcontractor who holds contracts or subcontracts, to which the provisions of this section are applicable, may file with the Secretaries of all the Departments concerned statements of actual costs of production and such other financial statements for any prior fiscal year or years of such contractor or subcontractor, in such form and detail, as the Secretaries shall prescribe by joint regulation. Within one year after the filing of such statements, or within such shorter period as may be prescribed by such joint regulation, the Secretary of a Department may give the contractor or subcontractor written notice, in form and manner to be prescribed in such joint regulation, that the Secretary is of the opinion that the profits realized from some or all of such contracts or subcontracts may be excessive, and fixing a date and place for an initial conference to be held within sixty days thereafter. If such notice is not given and renegotiation commenced by the Secretary within such sixty days the contractor or subcontractor shall not thereafter be required to renegotiate to eliminate excessive profits realized from any such contract or subcontract during such fiscal year or years and any liabilities of the contractor or subcontractor for excessive profits realized during such period shall be thereby discharged.

representatives of the petitioner and of the District Board at the board's office, at 10 a. m. on March 21, 1944. The meeting was postponed to March 24, 1944, at 3 : 30 p. m., at which time the petitioner's president, B. J. Sayles, met with E. A. France, Jr., a member of the District Board, and certain members of the financial analysis section of the board. At this meeting France stated in detail to petitioner's president the background, theory, practice, and application of the Renegotiation Act of 1942, as amended, to petitioner's business for its fiscal year ended April 30, 1943. During the meeting the representatives of the financial analysis section requested that petitioner furnish them with the necessary accounting and statistical information relating to petitioner's business for the fiscal year in question. Sayles agreed that the information would be furnished. It was arranged that, after the submitted statements had been reviewed by the District Board, another meeting would be held to ascertain the segregation of petitioner's business for its fiscal year in question between renegotiable and nonrenegotiable sales. Between March 31, 1944, and August 4, 1944, the petitioner furnished, from time to time, all of the data and information requested by representatives of the District Board. On August 4, 1944, the District Board issued its "Preliminary Report for Renegotiation with The Calorizing Company, Wilkinsburg, Pennsylvania, for the Year Ended 30 April 1943."

On August 14, 1944, a meeting was held between petitioner, represented by its president, and the District Board, represented by France and two others, at which detailed discussion of petitioner's position and the financial data prepared by the District Board took place. At the meeting petitioner was requested by the board to propose a tentative refund for its fiscal year ended April 30, 1943, which petitioner felt would be fair and equitable. At that time a copy of the above mentioned preliminary report for renegotiation was delivered to petitioner. At the conclusion of the meeting, a subsequent meeting of representatives of petitioner and the District Board was scheduled for August 18, 1944.

On August 18, 1944, the District Board met with petitioner's president and proposed that petitioner refund $125,000 of excessive profits for its fiscal year ended April 30, 1943. Petitioner's president refused to accept such a refund proposal, giving reasons therefor and making no alternative proposal. At the conclusion of this meeting, the board agreed to examine further into the matter.

On August 24, 1944, members of the District Board visited and inspected petitioner's plant and its method of operation. On that occasion petitioner's president submitted to them a copy of petitioner's audit statement for its fiscal year ended April 30, 1944, involving a revision of petitioner's 1943 profit and loss account.

On August 26, 1944, the District Board informed petitioner's president, by telephone, that the board still proposed a refund of $125,000 by petitioner as excessive profits from its renegotiable business for its fiscal year ended April 30, 1943. Petitioner's president was advised that he might procure a form letter to be used in requesting the Bureau of Internal Revenue to compute petitioner's tax credit, under section 3806 of the Internal Revenue Code, on the basis of a possible agreement for refund of the said $125,000. Petitioner's accountants thereafter made a recomputation of petitioner's tax, giving effect to the proposed renegotiation refund of $125,000 as excessive profits for the fiscal year ended April 30, 1943, and on September 13, 1944, mailed a copy thereof to the District Board.

On September 18, 1944, petitioner mailed a letter to the District Board which, at the board's request, amplified some data concerning the special and peculiar nature of petitioner's business, referred to in the District Board's preliminary report. The letter was in response to the board's request for a detailed statement of the basic features which, in the opinion of petitioner's president, must receive prime consideration to achieve the fair and equitable dealing contemplated by the Renegotiation Act.

On September 27, 1944, the District Board held its final meeting with the petitioner's president for the purpose of renegotiating petitioner's renegotiable business for its fiscal year ended April 30, 1943. At that meeting, the District Board informed petitioner that the factors and questions raised in petitioner's letter of September 18, 1944, to the District Board, had been fully considered and that the board reaffirmed its opinion that petitioner should refund $125,000 of excessive profits for its fiscal year ended April 30, 1943. After considerable discussion, petitioner's president stated his disagreement, and that he desired the proceeding to become an impasse case, to be sent to the War Department Price Adjustment Board at Washington, D. C. At the conclusion of the meeting, he was advised that the proceeding would be forwarded as requested.

On October 20, 1944, the District Board issued its "Report of Impasse with The Calorizing Company, Wilkinsburg, Pennsylvania, For the Year Ended 30 April 1943." The proceeding having been referred to Washington, a representative of the War Department Price Adjustment Board, hereinafter referred to as the Department Board, by telegram, requested petitioner's attendance at a hearing in Washington, D. C., on November 24, 1944, and also requested petitioner to confirm, by November 18, 1944, its attendance at the proposed hearing. On the same date, request was made, by mail, that the petitioner bring to the proposed hearing its most recent balance sheet and interim profit and loss statement and also its figures regarding unfilled orders on hand as of October 31, 1944.

The scheduled meeting of November 24, 1944, was held, with petitioner's president in attendance. He submitted at that time the information which had been requested with respect to the most recent balance sheet and profit and loss statement; also a statement of petitioner's unfilled orders. At that meeting, the Department Board proposed a refund of excessive profits by petitioner for its fiscal year ended April 30, 1943, in the amount of $100,000, if petitioner would agree thereto. Petitioner's president requested permission to consider the proposal, and agreed to notify the Department Board of petitioner's decision with respect thereto by December 1, 1944. After some further exchanges of information as to details of the proposal, and after submission of the matter by petitioner's president to its board of directors, petitioner, on January 1, 1945, by ordinary mail, advised the Department Board that its directors and stockholders declined the proposal for a refund of $100,000 of excessive profits for petitioner's fiscal year ended April 30, 1943. Receipt of this letter was acknowledged by the War Department under date of January 8, 1945, the petitioner being informed that the Department Board had forwarded petitioner's case to the Under Secretary of War for his consideration.

On January 25, 1945, the Department Board made its report on the case to the Under Secretary of War. Thereafter, on March 30, 1945, the Under Secretary of War, acting under delegation of authority from the Secretary of War, made a written unilateral determination that the petitioner had realized excessive profits of $100,000 from its renegotiable business for its fiscal year ended April 30, 1943. On March 30, 1945, a letter was mailed, by registered mail, transmitting to petitioner an executed original of the unilateral determination and demanding payment of the amount of such excessive profits, less the tax credit, if any, to which the petitioner was entitled.

Pursuant to the provisions of section 403 (c) (5) of the Renegotiation Act of 1942, as amended, the secretaries of the departments concerned promulgated joint regulations on February 1, 1943, which prescribed the forms relating to voluntary filing of financial information and the notice of renegotiation thereafter to be sent to the contractor, as referred to in section 403 (c) (5).

Petitioner has not at any time filed with the Secretary of War, or his authorized representative, the financial data for the fiscal year here involved in the form required by the regulations promulgated as above indicated; and the Secretary of War, or his authorized representative, has not at any time sent to petitioner; in the form set forth in the said regulations, a notice of intention to renegotiate.

In section 403 (c) (1) of the act it is provided:

Whenever, in the opinion of the Secretary of a Department, the profits realized or likely to be realized from any contract with such Department, or

from any subcontract thereunder whether or not made by the contractor, may be excessive, the Secretary is authorized and directed to require the contractor or subcontractor to renegotiate the contract price. When the contractor or subcontractor holds two or more contracts or subcontracts the Secretary in his discretion, may renegotiate to eliminate excessive profits on some or all of such contracts and subcontracts as a group without separately renegotiating the contract price of each contract or subcontract.

It is the claim of the petitioner that it has complied with the provisions of section 403 (c) (5) of the Renegotiation Act of 1942, as amended, in that it has furnished the respondent all of the information and the data required for renegotiation of its renegotiable business for the fiscal year ended April 30, 1943; that, having so complied with the provisions of that section, the period within which the respondent might give notice of intention to renegotiate its business for that fiscal year began to run; that the respondent did not give the required notice of intention to renegotiate within the period fixed by the statute, nor at any time thereafter; that, the time for giving such notice having now expired, the right of the respondent to renegotiate is barred and prohibited by the provisions of the statute, and the petitioner is discharged of any liability for any excessive profits realized by it from renegotiable contracts during its fiscal year ended April 30, 1943.

It is the claim of the respondent that the renegotiation proceedings were initiated pursuant to section 403 (c) (1) of the Renegotiation Act; that, on the facts and circumstances of this case, the period of limitations prescribed in section 403 (c) (5) does not apply; and that the renegotiation proceedings were properly and duly commenced and carried through to completion.

As we read the statute, section 403 (c) (1), *supra*, generally gives the secretary of the department the power and, whenever in his opinion justified, the duty, to renegotiate war contracts for the purpose of determining the amount of excessive profits, if any, realized by the contractor. Under section 403 (c) (6)[2] such renegotiation with respect to completed contracts must be commenced by the secretary within one year after the close of the fiscal year of the contractor or subcontractor within which the completion or termination of the contract or subcontract occurs. *J. H. Sessions & Sons*, 6 T. C. 1236. Under section 403 (c) (5), previously quoted in the margin, a contractor or subcontractor may, in the case of other contracts, start the running of a period of limitation by filing with the secretary of the department concerned statements of actual costs of production and such other financial statements for any prior fiscal year or years of such contractor or subcontractor, "in such form and detail, as the

---

[2] SEC. 403 (c) (6). * * * No renegotiation of the contract price pursuant to any provision therefor, or otherwise, shall be commenced by the Secretary more than one year after the close of the fiscal year of the contractor or subcontractor within which completion or termination of the contract or subcontract, as determined by the Secretary, occurs.

Secretaries shall prescribe by joint regulation." Thereafter the secretary must, within one year, give written notice to the contractor or subcontractor, "in form and manner to be prescribed in such joint regulation," that he is of the opinion that the profits realized from some or all of the contracts or subcontracts may be excessive, and fixing a date and place for the initial conference, to be held within sixty days thereafter. If under such circumstances the notice is not given and the renegotiation is not commenced within the time prescribed, the contractor or subcontractor is not thereafter required to renegotiate the said contracts for the purpose of determining the amount, if any, of excessive profits realized thereunder.

There is no claim here that any of the contracts covered by this proceeding were completed or concluded within the fiscal year ended April 30, 1943. To the contrary, the parties have stipulated that it is impossible to determine from the information and data submitted by the petitioner that any contract or subcontract was in fact completed or terminated within the said fiscal year. Accordingly, there is no claim or contention, and neither is there any factual basis, for applying the limitation provided by section 403 (c) (6), *supra.*

With respect to the period of limitation prescribed by section 403 (c) (5), *supra,* and its applicability here, the facts show that the submission of factual data was all instigated by request of respondent. There was no filing of information or factual data by the contractor until after the initial request of the respondent. The first request was made in March of 1944. The data and information requested at that time, or during the first months immediately thereafter, had been submitted to and was in the hands of the District Board by August 4, 1944, at which time the board's "Preliminary Report for Renegotiation" with the petitioner for the fiscal year ended April 30, 1943, was issued. The facts show that the renegotiation was actually under way before or during a meeting between petitioner and the board on August 14, 1944, and at the conclusion of that meeting a subsequent meeting was scheduled for August 18. At the meeting on August 18, the board made a definite proposal as to the amount of excessive profits. Some further negotiations were had and the final meeting of the District Board with petitioner's president for the purpose of renegotiating petitioner's renegotiable business for the said fiscal year was held on September 27, 1944. Being unable to reach an agreement, the proceeding was referred to the War Department Price Adjustment Board, in Washington, and under date of November 11, 1944, the petitioner, by telegram, was requested to attend a meeting in Washington, D. C., on November 24, 1944, for further renegotiation of its renegotiable business for the fiscal year here involved. After considerable more renegotiating, the parties were unable to reach an agreement and, as

a result, the unilateral order of determination was issued under date of March 30, 1945.

From the above facts, we conclude that all of the information required of the petitioner in respect of the renegotiation of its renegotiable business for the said fiscal year was furnished at various times during the year 1944, and after the first request, which was made by telephone on March 14, 1944. Notices and agreements as to the holding of the various renegotiation meetings and conferences undoubtedly issued for numerous meetings, and conferences, attended by petitioner's representatives, were held, at which the renegotiation of petitioner's renegotiable business for the fiscal year here under consideration was the business undertaken. As to the first meeting held in Washington, in November of 1944, we know that a notice specifically issued to petitioner in the form of a telegram. It is thus apparent that the data was submitted by the petitioner, notices of meetings were given by the respondent, and conferences on renegotiation were actually held and concluded, all within less than one year's time from the date of the first request by the District Board for data. It follows, we think, that there is no merit whatever in the contention of the petitioner that the unilateral determination of excessive profits against it by the respondent is barred by any period of limitation appearing in the statute. On the facts here, it is not even necessary to consider the argument of the petitioner, that the furnishing of the required information, whether voluntarily filed or not, starts the running of the period of limitation, under section 403 (c) (5), *supra*, or the contra contention of the respondent, that furnishing of the information and data must be voluntary. Even if the running of the statute was started in the instant case, the respondent, by the same token, gave notice of and began renegotiation within the period prescribed. The claim that the respondent did not act within the period required, because notice was not given in the form prescribed by the regulations, is of no aid to petitioner here, since by the same reasoning its failure to furnish the data and information in the form specified by the regulations would not start the running of the statute, in the first place. If the argument as to form is good against the respondent, it is equally good against the petitioner.

The claim of the petitioner being without merit, its motion for judgment will be denied by the entry of an appropriate order.