STEIN BROTHERS MANUFACTURING CO., A CO-PARTNERSHIP, LEO STEIN, EDWARD B. STEIN, JANE STEIN OGUSS, PETITIONERS, *v.* THE SECRETARY OF WAR, RESPONDENT.

Docket No. 23 R.   Promulgated September 26, 1946.

*Floyd F. Toomey, Esq., Thomas E. Jenks, Esq.,* and *John P. Lipscomb, Jr., Esq.,* for the petitioners.

*William V. Crosswhite, Esq., Julian R. Wilheim, Esq., Fred Curley, Esq.,* and *Newell A. Clapp, Esq.,* for the respondent.

874

OPINION.

MURDOCK, *Judge*: The petitioner's first contention is that no liability for excessive profits for the period in question exists, since the Secretary of War failed to give the written notice required by section 403 (c) (5) of the Renegotiation Act applicable hereto. That section provides that a contractor may file with the Secretary "statements of actual costs of production and such other financial statements * * * in such form and detail, as the Secretaries shall prescribe by joint regulation" and the Secretary, within one year thereafter, may give the contractor written notice "that the Secretary is of opinion that the profits realized * * * may be excessive, and fixing a date and place for an initial conference to be held within sixty days thereafter" and "If such notice is not given and renegotiation commenced by the Secretary within such sixty days the contractor * * * shall not thereafter be required to renegotiate" and its liabilities for excessive profits shall be discharged.

The petitioner claims that it filed the "statements of actual costs of production and such other financial statements" for the period here in question in March and May 1943, but the Secretary has never sent it the written notice for an initial conference required by section 403 (c) (5). The section referred to provides a limitation period, as does section 403 (c) (6). Those provisions were discussed in *J. H. Sessions & Son*, 6 T. C. 1236. See also *Calorizing Co.* v. *Stimson*, 7 T. C. 617. The purpose of (c) (5) was to give contractors an opportunity to hasten renegotiation and to start a period of limitations. It was enacted on October 21, 1942.

The petitioner did not seek to initiate renegotiation, to bring it to an early conclusion, or to start a period of limitation under (c) (5) by filing voluntarily the financial and other statements upon which renegotiation would have to be based. It made no move whatsoever until after it had received the letter of October 3, 1942, from the renegotiating authority stating that it had been designated to do the renegotiating and requesting that financial statements be furnished promptly. The statements requested were ones upon which renegotiation could be based. That notice was unlike the letter of March 3, 1943, considered in the *Sessions* case, *supra*, which merely asked for information helpful in assigning that contractor to some renegotiating agency and did not ask for data upon which a determination of excessive profits might have been made. The petitioner furnished financial statements for the period here in question only after one or more requests for such statements had been made by the renegotiating authorities. The actions and correspondence of the petitioner indicate that it never had any intention of initiating renegotiation or of starting a period of limitation under (c) (5). As a matter of fact, this point was never suggested until raised in an amended petition filed at the hearing. The respondent argues that (c) (5) never applies where the renegotiation is not initiated by the contractor through the filing of the statements required by (c) (5), and also contends that the petitioner never filed such statements. We do not find it necessary to decide either of those questions.

There were numerous letters and telephone calls between the parties hereto following the receipt by the petitioner of the letter of October 3, 1942. The initial conference in this case was held on December 7, 1942, which was long before the petitioner ever filed the statements upon which it relies. Obviously, as both parties recognized, the renegotiation in this case had begun long before March 22, 1943, and the renegotiation thus initiated in the fall of 1942 led directly, without interruption and without any new initiation, to the unilateral order of February 8, 1944. No notice for an initial conference could have been given after March or May 1943, because the initial conference had already been held in December 1942. Section 403 (c) (5) does not require, and was not intended to require, the Secretary of War to send a written notice for an initial conference where, as here, the initial conference had already been held and where renegotiation was under way, not only before the first financial statement relating to the period in question was submitted upon behalf of the petitioner, but even before section 403 (c) (5) was enacted. No such unreasonable intention can be attributed to Congress. The petitioner can not gain "discharge" under the provision which is so obviously inapplicable to the facts in this case. *Calorizing Co., supra*.

The petitioner argues in its brief that the statute gave the Secretary no authority to renegotiate the petitioner on the basis of the fiscal period here in question, unless it be recognized that the petitioner itself initiated renegotiation for that period by filing statements required under section 403 (c) (5), and, if that latter view is taken, then its liability was discharged as it has argued under the first issue discussed above. Its point is that the Renegotiation Act nowhere authorizes the Secretary to renegotiate on the basis of a single fiscal period, but only on the basis of completed contracts.[2] It argues that the renegotiation should be upon the basis of all of its war contracts, considered as a whole, during all years subject to renegotiation. There is no assignment of error raising an issue of the right of the Secretary to renegotiate this petitioner on the basis of the nine months here in question. Furthermore, there is no merit in the contention. It would have been impossible for the Secretary to have based his renegotiation upon any longer period. The business was conducted by a corporation prior to January 1, 1942, and after September 30, 1942, it was conducted by a partnership different from the present petitioner. Each successor apparently assumed and took over the uncompleted contracts of its predecessor. This petitioner was in existence only for those nine months, its accounts and profits cover only those nine months, and it can not be renegotiated for any other period. The contracts here in question were completed within the nine months in so far as this petitioner was ever going to complete them.

The petitioner argues in this same connection that a loss of $9,249.13 for 1941 should be absorbed by later profits because they resulted from the costly "make-ready" experience gained in 1941. The proposed amount of excessive profits of this petitioner was reduced $5,000 by the renegotiators apparently because of losses sustained by the predecessor corporation on war contract work during 1941. The successor partnership had large profits in later years as a result of the same early costly experience of the corporation. Thus, any loss which there may have been in 1941 was not ignored by the renegotiators. Apparently the large profits of 1943 are not going to escape renegotiation, but the Secretary has not regarded the profits of 1944 and 1945 as excessive. Consideration of the war contracts of this continuing business over the entire war period does not lead to a determination of a lesser amount of excessive profit for the period here in question.

The petitioner challenges the constitutionality of the Renegotiation Act. That statute deals only with war contracts and subcontracts. It applies to all such contracts, with exceptions not here important. It does not touch peacetime contracts or those which pertain to nonwar

---

[2] The subject of renegotiation on the basis of the contractor's income tax accounting period was discussed in *J. H. Sessions & Son, supra.*

goods. Renegotiation may result in repricing, but here it has resulted in the recapture by the Government of a part of the profits realized by a contractor upon Government war contracts entered into by parties dealing at arm's length. Authority for the Government to take such extraordinary action is justified only as a war measure and the provisions of the act will be discussed herein only as those of a war measure.

Article I, section 8, of the Constitution gives to Congress the power to wage war. See *Ex parte Quirin*, 317 U. S. 1, 26. Those are the powers essential to its survival when it is engaged in a terrible war. They are plenary. Although the Supreme Court said in *Ex parte Milligan*, 4 Wall. 2, that no provision of the Constitution is suspended even during the greatest exigency of the Government, certainly the desperate necessity of winning a war overshadows, for the duration, some peacetime privileges enjoyed under the Constitution. *Hirabayashi* v. *United States*, 320 U. S. 81; *Schenck* v. *United States*, 249 U. S. 47; *Korematsu* v. *United States*, 323 U. S. 214; *United States* v. *Macintosh*, 283 U. S. 605, 622. It is not necessary in this case to delimit precisely this war power. Renegotiation of contracts for goods needed by the Government to wage war is well within the boundaries. The Congress has the power and the duty under the war powers to enact legislation to prevent or to recapture excessive profits on contracts for goods which are needed to wage the war. Cf. *United States* v. *Bethlehem Steel Corporation*, 315 U. S. 289. Draft legislation sending citizens against the armed enemy to risk and lose their lives is constitutional. *Selective Draft Law Cases*, 245 U. S. 366; *Cox* v. *Wood*, 247 U. S. 3. What more need be said of the constitutional power of the sovereign state to meet all emergencies of a war forced upon it by fiendish foreign powers? It might, if sufficiently pressed, requisition or commandeer private property. Cf. *United States* v. *Russell*, 13 Wall. 623.

The petitioner does not question the power of Congress to pass a proper renegotiation act or to legislate with respect to excessive profits in wartime, but contends that this particular act is unconstitutional as applied in this case. The respondent introduced evidence to show the necessity for this particular legislation as a war measure. He was probably not obligated to do that, because an act of Congress is never presumed to be unconstitutional. See *Fairbank* v. *United States*, 181 U. S. 283, 285. The evidence, including the legislative history of the Renegotiation Act, shows, within tolerable limits, the reasons and the necessities for, and the purposes and appropriateness of, as war measures, the very provisions under attack. Production, procurement, morale, the curb of inflation, the efficient use for war of available wealth in men, money, materials, and productive capacity, the inability to anticipate costs on new products and on the mass production of

war goods, the difficulty or impossibility of accomplishing the desired result as satisfactorily and fairly in any other way, the time element, and other indicated factors not only justified, but required, the legislation here questioned. There is no countervailing evidence in the record.

The petitioner has discussed the Renegotiation Act, to a large degree, as if it were merely a peacetime statute to be judged by peacetime standards. Cases defining peacetime rights under the Constitution are helpful, but they do not decide the present question. The briefs of the petitioner are noticeably lacking in the citation or discussion of cases dealing with the constitutionality of war statutes. The petitioner ignores, as an adverse authority, the case of *Spaulding* v. *Douglas Aircraft Co.*, 154 Fed. (2d) 419. The Circuit Court of Appeals for the Ninth Circuit decided in favor of constitutionality practically all of the questions raised by the petitioner in this present case. The constitutional issues might almost be decided upon the reasoning of that case alone. See also *United States* v. *Pownall*, 65 Fed. Supp. 147; *United States* v. *Alexander Wool Combing Co.*, 66 Fed. Supp. 389.

Although the arguments presented in the petitioner's briefs do not follow precisely the assignments of error, nevertheless, all of its assignments and arguments have been carefully considered. The ones upon which it seems to place the greatest reliance are discussed herein, but none has been overlooked. We are unable to agree that the act is unconstitutional for any of the reasons advanced.

The petitioner claims that the Renegotiation Act is unconstitutional as applied retroactively to two contracts entered into and wholly or partially performed before April 28, 1942, the effective date of the act, even though payments were received on those contracts after that date. They contained no clause authorizing renegotiation. The act specifically covers contracts on which final payment had not been made on April 28, 1942. Sec. 403 (c) (6) (i). This, the petitioner says, takes its property without due process of law or just compensation in violation of the Fifth Amendment to the Constitution of the United States. It argues that the Government can not retroactively repudiate its obligation for accepted goods which had already arisen under those valid contracts. It cites no case holding that a statute, such as this, enacted as a war measure would be unconstitutional on this ground. The Supreme Court held in *United States* v. *Bethlehem Steel Corporation*, *supra*, that the Government could not repudiate a war contract on equitable grounds, but said that the Constitution has given to Congress power to make laws to protect the nation against war profiteering. Contracts for enormous amounts of war goods were incomplete

or not paid for on April 28, 1942. The renegotiation of the appellants in the *Spaulding* case was for the calendar year 1942. They may not have alleged that the contracts from which the excessive profits were realized were entered into prior to the enactment of the Renegotiation Act on April 28, 1942. Nevertheless, the Circuit Court said: "It matters not * * * that such war legislation is applicable to contracts made after the war-created demand exists but before the statute is enacted." It also said: "Though in essence different from taxation, the power in war to recapture for the war treasury excessive profits from existing contracts is certainly as great as the power in peace to tax in a succeeding year the income earned prior to the tax legislation." We agree with the court in the *Spaulding* case that Congress had a right to prevent war profiteering on all contracts for war-demand materials on which payment had not been made on April 28, 1942. It might have gone even further in applying the act retroactively. If the power exists, it is complete enough to prevent all war profiteering. Cf. *Lynch* v. *United States*, 292 U. S. 571, 579.

The petitioner next argues that there is an improper delegation of legislative powers to the Secretaries and to the Tax Court in violation of Article I, sections 1 and 8, and of the Fifth Amendment. It says this question can not be determined by reference to decided cases, but consideration must be given to the character of the power delegated, the necessity, the limitations placed upon the power delegated, and the historical background of administrative regulation in the particular field. The court covered this whole subject in the *Spaulding* case and held that there was not an improper delegation of powers. There is little need to add to what was said there. The petitioner particularly objects to the act because (1) the power delegated is novel, (2) it is quasi-judicial, involving an individual determination in each case, (3) the subject matter is capable of precise definition by Congress, without delegation of authority, and (4) there are no restraints upon the exercise of the power either in the form of guides or standards as to what is meant by "excessive profits" or in the form of procedural restraints such as requirements for notice, hearing, recording, findings of fact, and statement of reasons for a determination.

The first and third numbered points above deserve scant comment. A novel piece of legislation is not *ipso facto* unconstitutional. Problems may arise in peace and war for which there are no empirical solutions. The petitioner states that the subject matter is capable of precise definition by Congress without delegation of authority, but it has failed to demonstrate this point. It says at one place that the delegation is of legislative powers and at another that it is of quasi-judicial powers. Its real objection seems to be that the Secretaries are author-

ized and required to make a determination in each case without any over-all standards or guides to bring about uniformity and impartial treatment of the various contractors.

It is true that the elastic phrase "excessive profits" is not defined in the act and, as a consequence, much is left to the judgment of the men charged with the administration òf this law and, ultimately, to this Court. But the use of that term is not, under the circumstances, an unconstitutional delegation of powers. Similar indefinite terms have been used and approved in peacetime legislation, of which the respondent cites many examples. See *Mutual Film Corporation* v. *Ohio Industrial Commission*, 236 U. S. 230, 245–246. The provisions for relief from excessive profits tax are elastic and require decisions by an administrative officer and, finally, by this Court, with review of the determination by this Court denied. See section 722 and related provisions of the Internal Revenue Code and their legislative history. If such powers can be delegated to one department or agency, we do not follow the petitioner's argument that the presently attacked powers may not be delegated constitutionally to the Secretaries, at least as a war measure. The legislature can delegate a power to determine some fact or state of things upon which the application of a law depends. *Field* v. *Clark*, 143 U. S. 649.

The court, in the *Spaulding* case, discussed at some length the question of whether there were sufficient standards and guides for the administration of the Renegotiation Act. We shall not repeat what was said there. It distinguished such cases as *Panama Refining Co.* v. *Ryan*, 293 U. S. 388; *United States* v. *Cohen Grocery Co.*, 255 U. S. 81, and *Small Co.* v. *Am. Sugar Ref. Co.*, 267 U. S. 233. The case of *Schechter Corporation* v. *United States*, 295 U. S. 495, is similarly distinguishable. The word "excessive" has a generally understood meaning. This is borne out to some extent by the fact that contractors and the Secretaries have been able to agree as to the amount of excessive profits, except in the relatively few cases in which unilateral orders were issued. The word is used several times in the Constitution. It means more than is reasonable. "Reasonable" is an elastic term which has been used repeatedly with approval where its meaning must be interpreted by executive officers. *Field* v. *Clark, supra*, p. 680; *Union Bridge Co.* v. *United States*, 204 U. S. 364; *Avent* v. *United States*, 266 U. S. 127; *Sunshine Coal Co.* v. *Adkins*, 310 U. S. 381, 398. Congress, in section 403 (c) (3), indicated some guides to be used. Factors deemed relevant were already known by Congress to be in use in voluntary renegotiations when the act here in question was enacted. The Secretaries directed the renegotiating authorities to use those same factors and their use as to subsequent years was later required by an amendment to the Renegotiation Act. See section 403 (a) (4) (A)

as provided in section 701 of the Revenue Act of 1943. They are the factors which any reasonable person would naturally use in determining the amount of excessive profits. Furthermore, it must be remembered that the powers delegated to the Secretaries need not be judged by peacetime standards. *Hirabayashi* v. *United States, supra; United States* v. *Chemical Foundation*, 272 U. S. 1. This is a war measure. It is not surprising that broad powers have to be given to Secretaries in wartimes. The law had to be administered in some way. Various methods might have been proper. The evidence shows that more rigid controls were considered and rejected. Congress has wide discretion in selecting the method to carry out such a law, and the means taken were a reasonable solution of a difficult problem. *Spaulding* v. *Douglas Aircraft Co., supra; Hirabayashi* v. *United States, supra; Yakus* v. *United States*, 321 U. S. 414; *Hamilton* v. *Kentucky Distilleries Co.*, 251 U. S. 146; *United States* v. *Wright*, 48 Fed. Supp. 687. The statute is justifiable as a war measure regardless of whether or not some other system might have been better.

The petitioner's argument that the act deprives it of procedural safeguards necessary to due process is answered by the discussion of the court in the *Spaulding* case. Its contention that the determination in this case was wholly arbitrary and capricious is without merit. The procedure was at first left to the Secretaries. No official record of the proceedings was made available to the petitioner in this case, full findings of fact were not made, and no written exposition of the Secretaries' reasons was furnished to the petitioner. However, it appears that the petitioner was given a full and fair hearing. The renegotiation was initiated by a subordinate of the Secretary of War, who notified the petitioner by mail that it had contracts subject to renegotiation and it should submit certain data with respect thereto. Thereafter a number of conferences were arranged and held. Representatives of the petitioner attended. The petitioner was given ample notice and opportunity to present all evidence and arguments which it deemed relevant. It presented its evidence and arguments. They were received and considered. The petitioner approved of the factual data before the War Department. The petitioner was orally advised of the position of the Government. There is no showing that the negotiators for the War Department acted arbitrarily or capriciously, or that they failed to apply uniformly the guides and standards prescribed for use in renegotiating. The indications are that they were eminently fair. They tried persistently to reach an agreement with the petitioner. One contention advanced by the petitioner led to a reduction in the determination theretofore proposed. No authority or sound reason appears for a holding that the determination was either arbitrary or capricious. Furthermore, the petitioner

has now had a hearing *de novo* before this Court at its own request, in accordance with the act. *Aircraft & Diesel Equipment Corporation* v. *Hirsch*, 62 Fed. Supp. 520, 524. Cf. *Phillips* v. *Commissioner*, 283 U. S. 589. None of the procedural safeguards mentioned by the petitioner are absent here. The petitioner has not been deprived of due process as that term applies to a wartime statute of this kind.

The petitioner's final argument on constitutionality is that the provision making the determination by the Tax Court final renders the whole act unconstitutional, since it deprives the petitioner of any judicial review, as required by the Constitution. It apparently bases this argument upon the fact that this tribunal is described in section 1100, Internal Revenue Code, as an independent agency in the executive branch of the Government and has never been made a statutory court. The petitioner says that the hearing before and "the determination of excessive profits by the Tax Court becomes a vain and idle thing, productive only of delay and expense and advancing the controversy no nearer final disposition," since it merely repeats an administrative act and "must in turn be subject to judicial review *de novo.*" It concludes that there must be a full review in a constitutional court.

There are at least two answers to this argument. First, the point was decided adversely to the petitioner in the *Spaulding* case. The petitioner has not supported its argument by the citation of any cases dealing with legislation enacted to carry out a war power. We are not persuaded by the petitioner's argument that due process has been denied it. Cf. *Heiner* v. *Diamond Alkali Co.*, 288 U. S. 502, upholding an act under which a determination of the Commissioner, reviewable by this tribunal, was not reviewable by any constitutional court.

Furthermore, the petitioner would gain nothing by having this Court hold the law unconstitutional because of the provision making final the decision of this Court on the merits. The prohibition against review, of which the petitioner complains, is only as to the amount of excessive profits. Even if that provision were unconstitutional, the remainder of the act would not be invalidated (section 403 (g)) and the Tax Court would still be required to hear this proceeding and to enter an order determining the correct amount of excessive profits. The petitioner, by coming into this Court, has recognized that the proceeding here is at least a necessary step in the administrative process which must be exhausted before consideration could be given to the question in a constitutional or statutory court. *Macauley* v. *Waterman S. S. Corporation*, 327 U. S. 540. *Knowles* v. *Hirsch*, 65 Fed. Supp. 690; *Wade* v. *Stimson*, 65 Fed. Supp. 277. We think the provision is constitutional and, if so, the decision

here on the merits will be final, but if we are wrong, the constitutional courts will be able to say so.

We have concluded that the Renegotiation Act is not unconstitutional for any of the reasons advanced by the petitioner.

The next question is whether contract W535 AC-20909 was one continuing separate contract for 20,000 bags and change order No. 1 was a separate contract for 10,000 bags, or whether those two documents formed a single contract for 30,000 bags. The petitioner contends that contract 20909 remained a separate contract for 20,000 bags and it is excluded from renegotiation by section 403 (c) (6), since final payment for those bags was made prior to April 28, 1942. It is conceded that the petitioner is right if the parties did not eventually have one single contract for 30,000 bags. The respondent makes only one answer to this contention. He argues that contract 20909 was later changed by the parties into a contract for 30,000 bags. The final payment for the full 30,000 bags was not made prior to April 28, 1942.

We are satisfied that the parties entered into two different agreements, but the difficulty is to determine whether the second agreement effected a new single integrated contract for 30,000 bags or whether it left entirely separate and unchanged the original contract for 20,000 bags and effected merely a new and separate contract for 10,000 bags. The change order of October 8, 1941, amended the original contract 20909. It left unchanged many terms of that contract, so that they applied to 30,000 bags instead of to 20,000 only. An amendment such as this does not leave the original contract as a separate enforceable contract, but changes the old contract into a new one. That is what the words "amend or supplement" mean in this connection and that is what was done by the agreement of the parties. The change order is a short instrument as compared with contract 20909. It is not a complete contract in itself, separate from 20909, but with 20909 it forms one complete, new contract for 30,000 bags. This new contract was the subject of a further change order dated December 9, 1941, and executed by the parties on that same day. It is obvious from the evidence that the parties recognized and treated contract 20909, thus twice changed, as one single contract for 30,000 bags and not as two separate contracts, one for 20,000 bags and one for 10,000 bags. We hold that there was but one contract finally and that the Secretary did not err in subjecting all profits on that contract to renegotiation.

The Secretary of War made a unilateral determination that the profits of this petitioner on war contracts subject to renegotiation for the period January 1 to September 30, 1942, were excessive to the extent of $100,000. The petitioner contends that it had no excessive profits for that period, while the respondent now claims that the unilateral

determination was too low and the profits for that period were excessive to the extent of $150,000. The parties are in disagreement as to two points only in so far as the amount of profits is concerned. The petitioner has argued unsuccessfully that the profits on the first 20,000 bags manufactured under contract No. 20909 were not subject to renegotiation. The other disputed point has to do with an allowance for compensation for services of active partners.

Section 403 (c) (3) of the Renegotiation Act, applicable hereto, provides for recognition of deductions allowed for income tax purposes. A partnership is not allowed any deduction for income tax purposes on account of compensation of active partners, but the renegotiating authorities have recognized that allowance should be made for reasonable compensation for services actually rendered by them. The renegotiators have concluded in the present case that a reasonable amount representing total compensation for Leo Stein and his son, the active partners, for the period here in question would be $36,000. The petitioner does not contend for the recognition of any larger amount, but the respondent now contends for a smaller amount. We accept the $36,000 figure. It is not clear from the record just how much of that total Stein compensation the renegotiators felt should be allocated to the renegotiable business and how much to the nonrenegotiable business. The evidence shows that the executive duties were shared about equally by Manning and Leo Stein, and to a much lesser extent by Edward Stein. The parties have filed an agreed statement in which approximately two-thirds of Manning's salary is allocated to the renegotiable business and about one-third to other business. We see no reason why this ratio, which the parties felt was proper in the case of Manning, should not be applied in allocating the theoretical compensation of Edward and Leo Stein between the two branches of the business. The result is to allocate $24,000 of the total Stein compensation to renegotiable business.

Manning and Leo Stein were largely responsible for the success of the petitioner's business. They worked hard and tried to do their work well. Regardless of whether or not executives in other businesses were more capable and more efficient, it is fair to say, on this record, that the executives of this business did a good job and enabled it to rank at or near the top as a manufacturer in its particular field. They effected some reductions in the cost of materials going into the bags. They did what they could in finding satisfactory substitutes for scarce and critical materials. They tried to cooperate with the Government and other manufacturers. They shared their experience and knowledge with other manufacturers, as a contribution to the war effort. They were energetic, diligent, and patriotic. However, it should be borne in mind that the actual compensation of Manning for

the nine months here in question and the theoretical amounts allowed for compensation for the two Steins are several times as large as the compensation that these same persons received for their services in prior years. The amounts adequately recognize the increased duties, responsibilities, and contributions of these three men to the business during this war period.

The above discussion settles all of the controversy of the parties regarding the amount of profits on the renegotiable business for the period here in question. The amount now appears as $214,558.36, after making ample allowance for compensation for services of the active partners. The question is how much of that amount represents excessive profits. The unilateral determination was that $100,000 of the total was excessive, leaving $114,558.36 for the petitioner. We have no doubt, after considering the entire record, that at least $100,000 of the total was excessive as determined by the Secretary of War. The respondent now contends, however, that at least $150,000 of the total was excessive, and we think the real question lies there. That would leave $64,558.36 as reasonable profits for the nine months here in question. The evidence must be examined to see if it supports this affirmative contention of the Secretary of War. We shall not attempt to mention every thought which we have had upon the subject, or to mention all of the factors which must be and have been considered, but our reactions on some of the more pertinent factors in this case will be set forth below.

One of the important factors in determining whether or not profits are excessive is the amount of fixed assets and other capital risked and used in the renegotiable business. It seems proper to make a comparison in this connection between the renegotiable business and the peacetime business of the predecessor corporation. The fixed assets of the corporation turned over to the petitioner partnership on January 1, 1942, were carried on the books at about $12,000. Additions were made during the nine months here in question and at the end of that period the fixed assets were shown on the books at about $22,000. It is difficult to tell just what the total amount of capital used in the partnership business was. The renegotiators concluded that the net working capital used in the business of the petitioner was about $82,-000. The petitioner does not try to demonstrate that the net capital actually used in the business was larger. It must be remembered that not all of the fixed assets and capital used in the petitioner's business was used exclusively in connection with the renegotiable business. Also it should be remembered that the risk in dealing with the Government on large contracts during this period was probably considerably less than the risk of manufacturing for civilian use during peacetime. There was some risk, of course, but there was no great risk

involved in the renegotiable business. It seems safe to conclude that a profit of $64,558.36 would be a very large return on whatever capital was risked and used in this particular business during the period here in question.

Another question to be considered is the effect which the war contract business had upon the peacetime or commercial aspects of the business. The agreed statement filed by the parties shows that the petitioner had net sales of commercial business amounting to about $167,000 on which it realized profits of about $37,000 before Stein salaries. The net sales of the predecessor corporation averaged about $237,000 in peacetime, but its average comparable profit thereon was only about $16,000. Thus, the war profits were not realized at a sacrifice of large commercial profits.

It seems proper to consider also the reconversion problem, if any, of this contractor. This particular partnership had no such problem because a successor partnership made up of substantially the same persons took over its entire assets and business. Furthermore, that successor partnership went on with the same war contract business and made large profits for the next three years, and there is no indication that it had any serious reconversion problem at the end of that period.

Another comparison which is helpful is one showing the relationship between peacetime profits, sales, and capital and wartime profits, sales, and capital. The manufacture by the petitioner of the articles under the contracts subject to renegotiation was a change from the articles manufactured by the corporation during peacetime. However, the change could have been much greater. The process of manufacture of the B-4 bags was somewhat similar to that of the peacetime products of the corporation, even though the material used was different and the process of manufacturing the bags involved more and somewhat more difficult operations. Both processes were relatively simple from the standpoint of manufacturing technique. The differences do not rob a comparison of the two businesses of all significance. The average peacetime profits of the corporation, after deducting officers' salaries, were about 1½ per cent of net sales for the five years shown. The net sales on renegotiable contracts for the three-fourths of a year here in question were substantially more than four times the average peacetime net sales of the partnership. The peacetime business was one in which relatively few duplications of a relatively large assortment of articles were manufactured to meet the demands of the trade. The wartime business was one in which a relatively large number of duplicates of only four articles were manufactured on Government contracts. The change, generally speaking, was a change to mass production. It was reasonable to expect the amount of profits to increase as the volume of sales increased, but the per-

centage of profits to sales might reasonably have been expected to decrease rather than to increase under the change. Yet here the reverse is true, even if $150,000 of excessive profits is eliminated. A profit of $64,558.36 would exceed 5½ per cent of the renegotiable sales for the nine months here in question. Thus, as the volume of sales increased this profit would also represent a percentage of sales about three and one-half times that obtained upon the smaller peacetime sales. Profits in that amount would also represent a very much larger return in total dollars and in percentage on the capital invested and used in the renegotiable business than would the peacetime profits of the corporation on its capital. It seems apparent, after giving consideration to these tests and others, that profits of $64,558.36, after compensation has been allowed for personal services of partners, is a handsome return on the investment of this partnership in this business during these particular nine months and one which any business should be happy to realize in any period, whether of peace or of war.

The petitioner draws attention to various favorable factors in its record of producing war goods. We recognize those factors fully, but we think that the profit above mentioned contains an ample cushion to absorb the allowances for all of the favorable things that may be said about the petitioner's performance under the war contracts, including its good production record, its timely deliveries, the excellence of its product, the cooperation and contributions which it made to improve the product and to help competitors, the economies and savings which it effected, and the fact that it received no financial aid from the Government.

It has been recognized all through renegotiation that contractors should be encouraged to effect savings in the cost of war goods manufactured by them, and, so that there might be some incentive, the renegotiators have made a practice of allowing a part of the savings to be retained. We have no disposition to disturb that practice, now expressly required under section 403 (a) (4) (A) (i). The petitioner has attempted to show the approximate amount in dollars of certain savings which it claims to have effected. We are satisfied that it did effect some saving in the purchase of laminated sateen. It claims that the approximate amount of the saving was $9,200. It is not necessary to determine the precise amount, but we are not satisfied that the saving was quite as large as the petitioner claims. Furthermore, this saving and all of the alleged savings to which it points cover the entire operation under Government contracts up to September 30, 1942, not of the petitioner alone, but also of the predecessor corporation during a large part of 1941. We are satisfied too that it effected some saving on leather handles and other leather parts. The evidence

in regard to some of the other items, however, is not so impressive. Some of the alleged savings represent merely the difference between the price which the petitioner or corporation paid at one time for materials and lesser amounts which the petitioner later paid for similar items. This does not demonstrate any saving on the part of this petitioner as compared with what might reasonably be expected of any manufacturer or as compared with other manufacturers of B-4 bags. It was the duty of the executives of the petitioner, for whose compensation large allowances were made, to search for and obtain materials at the lowest costs available. It appears also that the reductions just referred to were due in part to changes to cheaper materials and to the fact that the later orders were for larger quantities than were the earlier ones. We do not mean, by this discussion, to minimize completely the fact that the petitioner did a reasonably good job in obtaining materials at fair prices and that it probably did effect some savings in its costs as compared with those of its competitors. Some allowance should be made to reward it for its savings and its good performance as a contribution to the war effort. However, as stated above, there is ample cushion in the profits of $64,558.36 to allow for all of those factors.

The record does not afford an adequate factual basis for comparing this petitioner with others on capital, sales, and profits in peace and war, and on excessive profits. We express no opinion on whether or not and to what extent such information would be helpful or admissible here. However, it is possible that such comparable data and other information not in the present record may have been available and considered in the renegotiation of this case. We are fully aware of this in determining an amount of excessive profits different from that determined in the renegotiation. However, Congress has made it our duty to make a determination to the best of our ability upon the evidence in the record, and that is what we have done.

The petitioner has introduced evidence to show that the successor partnership was awarded the Army and Navy "E" in the summer of 1945. There is also evidence of awards of "A" and "B" ratings to the successor partnership upon the efficiency of its inspection. Due weight has been given to that evidence. While the later awards probably took into consideration the record of this petitioner for the nine months here in question, nevertheless, it must be remembered that the awards were made to a successor partnership, long after the petitioner had gone out of existence. The evidence shows that the petitioner's record and that of its predecessor and successor stood high in comparison with others in these fields; nevertheless, some of the competitors ranked ahead of the petitioner on performance in certain respects. Suffice it to say that the record was good enough to entitle the peti-

tioner to a favorable consideration on the subject of renegotiation of the contracts here in question.

One of the purposes of renegotiation was to bring the contract prices of war goods down to the point where no excessive profits would be realized upon those contracts. That was apparently accomplished eventually in the business here under consideration. The record shows that the successor partnership was given a "clearance" for 1944 and 1945, i. e., its profits for those years were not regarded as excessive by the Secretary of War. It had profits for 1944 of $66,030.19 on war goods net sales of $953,593.30 and profits for 1945 of $79,301.66 on war goods net sales of $1,153,217.77, before Stein salaries. The profits after Stein salaries are said to be $26,630.52 and $40,267.10. Those earnings were apparently adequate and economically satisfactory. Those were full years. A comparison of those figures with those for the nine-month period here in question would not indicate that profits of $64,558.36, after Stein salaries, on net sales of war goods of $1,170,-000, would be inadequate or that the additional profits of $150,000 were not excessive. They would indicate, on the contrary, that *at least* $150,000 of the profits here in controversy were excessive.

This petitioner and its predecessor demonstrated ability to produce on schedule a relatively large quantity of good quality bags with prices comparable to those asked by other manufacturers. This demonstrated ability was obviously appreciated by the Government, as is indicated by the number and size of the contracts awarded and by the allowances made in the renegotiation. However, this petitioner made large profits from its Government contracts. The patriotism and desire of the partners to contribute to the war effort did not prevent them from making those large profits, and, all things considered, those profits were excessive when judged, as best we can, by what seems fair and reasonable in accordance with the directions of the Renegotiation Act applicable hereto.

Obviously, the excessive profits can not be determined with precise mathematical accuracy and, fortunately, the respondent is not urging this Court to pare the profits of this petitioner to the point where there would be serious doubt about the reasonableness of the amount left undisturbed. It is our best judgment, after giving careful consideration to all of the evidence in the case and to the arguments and contentions of counsel, that $150,000 of the profits of this petitioner from renegotiable business for the period here in controversy was excessive within the meaning of that term as used in the Renegotiation Act applicable hereto.

Reviewed by the Court.

*An order will issue in accordance herewith.*