J. H. SESSIONS & SON, PETITIONER, *v.* THE SECRETARY OF WAR, RESPONDENT.

Docket No. 224 R.   Promulgated May 29, 1946.

*Albert F. Reardon, Esq.*, and *W. T. Durant, Esq.*, for the petitioner.
*Robert H. Winn, Esq.*, for the respondent.

### OPINION.

MURDOCK, *Judge*: The Secretary of War made a unilateral determination that $90,000 of the profits realized by the petitioner during its fiscal year ended December 31, 1942, under contracts and subcontracts subject to renegotiation pursuant to the provisions of the Renegotiation Act were excessive. The statutory notice of this determination dated March 27, 1945, was mailed to and received by the petitioner. The present proceeding is brought to contest that determination. The petitioner has assigned two errors, but argues only one, and will be deemed to have abandoned the other. He argues another point, but that point will not be considered since it is not put in issue by the pleadings. The only issue which is properly presented for decision is whether the Secretary erred in commencing renegotiation proceedings more than one year after December 31, 1942, the close of the fiscal year covered by the renegotiation.

The parties have filed stipulations of facts and some allegations of the petition have been admitted. The facts as thus agreed upon by the parties are adopted as the findings of fact.

The petitioner is a Connecticut corporation, with its principal office at Bristol in that state. It keeps its books upon a calendar year basis. The record does not show whether it uses a cash or accrual method of accounting. It manufactures and sells stampings and hardware used in the manufacture of luggage, chests, boxes, and similar articles to contractors and purchasing officers upon purchase orders executed by them. The renegotiation and unilateral determination are based upon the petitioner's accounting year, which was the calendar year 1942. The parties are not in disagreement as to what contracts are subject to renegotiation for that period. The renegotiation and the unilateral determination are based upon all receipts and accruals up to the close of the year, except those from contracts on which final payment had been made prior to April 28, 1942.

The petitioner contends that section 403 (c) (6) of the Sixth Supplemental National Defense Appropriation Act, as amended by section 801 of the Revenue Act of 1942, is applicable in this case; it provides that no renegotiation shall be commenced more than one year after the close of the fiscal year selected by the Secretary for renegotiation; the renegotiation in this case was not commenced within one year after the close of 1942; and, therefore, no renegotiation was permitted under the law.

The first argument of the respondent is that the provision of section 403 (c) (6), upon which the petitioner relies, does not apply to a case like this, in which all contracts producing income in 1942 were renegotiated collectively or "overall" upon the basis of income and expenses of that year applicable to those contracts. It is his position that section 403 (c) (5) applies exclusively to "overall" or fiscal year renegotiation and the provision of (6) upon which the petitioner relies applies only to renegotiation of individual contracts.

Section 403 (a) contains a number of definitions. (b) provides for the insertion of certain provisions in contracts made by the departments. (c) (1) provides that the Secretary may require a contractor "to renegotiate the contract price" whenever he thinks the profits realized or likely to be realized may be excessive. It also provides that, where two or more contracts are held by the same contractor, the Secretary, in his discretion, may renegotiate to eliminate excessive profits on some or all of such contracts as a group without separately renegotiating the contract price of each contract. This applies to subcontracts as well. (c) (2) authorizes the Secretary, upon renegotiation, to eliminate any excessive profits in various ways. (3) provides that the Secretary shall recognize properly applicable exclusions and deductions allowed under the Internal Revenue Code and shall

allow credit for taxes under the code. (4) authorizes the Secretary to make final agreements with contractors for the elimination of excessive profits. (5) and (6) are as follows:

(5) Any contractor or subcontractor who holds contracts or subcontracts, to which the provisions of this section are applicable, may file with the Secretaries of all the Departments concerned statements of actual costs of production and such other financial statements for any prior fiscal year or years of such contractor or subcontractor, in such form and detail, as the Secretaries shall prescribe by joint regulation. Within one year after the filing of such statements, or within such shorter period as may be prescribed by such joint regulation, the Secretary of a Department may give the contractor or subcontractor written notice, in form and manner to be prescribed in such joint regulation, that the Secretary is of the opinion that the profits realized from some or all of such contracts or subcontracts may be excessive, and fixing a date and place for an initial conference to be held within sixty days thereafter. If such notice is not given and renegotiation commenced by the Secretary within such sixty days the contractor or subcontractor shall not thereafter be required to renegotiate to eliminate excessive profits realized from any such contract or subcontract during such fiscal year or years and any liabilities of the contractor or subcontractor for excessive profits realized during such period shall be thereby discharged.

(6) This subsection (c) shall be applicable to all contracts and subcontracts hereafter made and to all contracts and subcontracts heretofore made, whether or not such contracts or subcontracts contain a renegotiation or recapture clause, unless (i) final payment pursuant to such contract or subcontract was made prior to April 28, 1942, or (ii) the contract or subcontract provides otherwise pursuant to subsection (b) or (i), or is exempted under subsection (i), of this section 403, or (iii) the aggregate sales by the contractor or subcontractor, and by all persons under the control of or controlling or under common control with the contractor or subcontractor, under contracts with the Departments and subcontracts thereunder do not exceed, or in the opinion of the Secretary concerned will not exceed, $100,000 for the fiscal year of such contractor or subcontractor.

No renegotiation of the contract price pursuant to any provision therefor, or otherwise, shall be commenced by the Secretary more than one year after the close of the fiscal year of the contractor or subcontractor within which completion or termination of the contract or subcontract, as determined by the Secretary, occurs.

The respondent reviews the history of renegotiation, and of the laws pertaining thereto, to show that Congress was fully aware of the fact that two distinctly different methods of renegotiation were in use at the time it enacted as a part of the Revenue Act of 1942 the first limitation provisions, which are the provisions quoted above. Originally, renegotiation involved the repricing of separate contracts. That method has continued to be used for the renegotiation of contracts (usually those for large items) which do not lend themselves to renegotiation on the basis of a fiscal year. But the Secretaries later concluded that in all other cases renegotiation should be conducted on what is described herein as an "overall" method. That is, all contracts under which a given contractor had furnished goods

during its accounting and income tax year would be renegotiated collectively. The gross receipts for the accounting year might include receipts on contracts which were not fully completed within that year. The receipts from such contracts for the subsequent year would be considered in the renegotiation of that later year. The law does not limit renegotiation to completed contracts and section 403 (c) (1) gave the Secretaries authority to renegotiate to eliminate excessive profits on two or more contracts at the same time. The respondent admits, however, that the "overall" or fiscal year method was first adopted by the Secretaries without express statutory authority. He says its adoption was justified because it so well served the best interests of all concerned. For example, it used the contractor's income accounting and bookkeeping year, which was a great convenience to contractors where the receipts and expenses of the calendar year fairly reflected the profits up to the close of the year on all contracts upon which goods were furnished during the year. The present petitioner makes no complaint whatsoever about the method used.

The respondent argues that Congress intended that the limitation provided in section 403 (c) (5) was to apply exclusively to the "overall" or fiscal year renegotiations and the limitation provided in 403 (c) (6) was to apply only to the old single contract type of renegotiation. He argues that this intention is apparent from the words used in the provisions and from statements made by the legislators while they were enacting these new limitation provisions. He also argues that great confusion would result if section 403 (c) (6) were to be applied to "overall" or fiscal year renegotiation cases. That limitation is against renegotiation commenced more than one year after the close of the fiscal year within which completion or termination of a contract occurs, and the respondent's position is that "overall" or fiscal year renegotiation may involve some contracts which are not completed within the year so that the limitation will apply as to a part of the renegotiation only. The departments published a "Joint Statement" on March 31, 1943, in which they adopted the interpretation of these limitation provisions for which the respondent now contends.

An examination of the legislative history of the limitations of sections 403 (c) (5) and (6) supports the petitioner's contention that (6) has general application rather than the contention of the respondent that (5) alone was to apply to "overall" or fiscal year renegotiation and (6) was to apply only to single contract renegotiation. It is apparent that the provisions of (5) will not serve to cut off a Secretary's right to renegotiate at an earlier date than will (6) in so far as contracts completed in a prior fiscal year are involved in the renegotiation unless by "joint regulation" of the Secretaries.

The right given to a contractor by (5) is to file statements "for any prior fiscal year or years of such contractor." Thus, the statements can not be filed until after the close of the year, whereas the limitation period of (6) begins by the mere elapse of time precisely at the close of the prior fiscal year. But (6) can serve to cut off renegotiation only on contracts completed or terminated within that period, whereas (5) apparently operates to cut off renegotiation to eliminate excessive profits realized on any contract completed or uncompleted within such fiscal year. Of course (5) was not designed to permit a contractor to start a one-year period of limitations on his fiscal year 1942 where he obtained in that year a contract for the construction of a battleship which would take several years to complete, but that is no reason for holding that (6) is not general in its application. Nowhere in the history of these provisions is there any suggestion of the nice distinction between the two methods of renegotiation upon which the respondent's argument is based. The statement that in no event is renegotiation to be begun more than one year after the close of the fiscal year in which the contract or subcontract was completed, appears repeatedly. If the legislators had in mind the distinction which the respondent makes, it seems only reasonable to expect that somewhere in the legislative history or in the provisions themselves some attention would have been focused upon it.

We are mindful of the fact that the administration of renegotiation may now be nearing its close and that any interpretation of the law at this late date which might throw the whole subject into confusion would be unfortunate. Nevertheless, laws must be read as they were written, despite the fact that someone charged with their administration may have interpreted them differently. Here the words of Congress are clear and seem to carry out the intention which Congress apparently had in mind. The last sentence of (6), upon which the petitioner relies, clearly provides that in all cases renegotiation as to any contract completed within a fiscal year must be commenced within one year after the close of that year.

The respondent points to the fact that these limitation provisions were changed by an amendment in section 701 of the Revenue Act of 1943. The provision to which he refers is placed by the 1943 amendment in section 403 (c) (3) and is as follows:

No proceeding to determine the amount of excessive profits shall be commenced more than one year after the close of the fiscal year in which such excessive profits were received or accrued, or more than one year after the statement required under paragraph (5) is filed with the Board, whichever is the later, and if such proceeding is not so commenced, then upon the expiration of one year following the close of such fiscal year, or one year following the date upon which such statement is so filed, whichever is the later, all liabilities of the contractor or subcontractor for excessive profits received or accrued during such fiscal year shall thereupon be discharged.

The respondent suggests that this new legislation only clarified the earlier provisions and shows that they were intended to mean what the respondent here contends they mean. The above quoted provision is obviously new legislation which definitely changed various procedures theretofore in use. It does not aid the respondent in his argument. It seems to apply a one-year period of limitation to all kinds of renegotiation. There is nothing in the provision itself or in its legislative history to indicate that it was not new legislation but merely a clarification of existing law.

The next question is whether the renegotiation of this petitioner for 1942 was commenced within one year after the close of that year. The Price Adjustment Board sent the petitioner a letter from the Office of the Under Secretary of War. The letter was dated March 3, 1943, and was received by the petitioner on the following day. That was the first communication of any kind which the petitioner received from the Government on the subject of the possible renegotiation of its contracts for 1942 and was the only communication sent to the petitioner by the Government during 1943 which is alleged by the Government to have any significance herein.

The letter, including the signature, was all mimeographed. The first two paragraphs of the letter contain a general statement that Price Adjustment Boards had been established by the War Department and other agencies pursuant to section 403 of the Renegotiation Act to conduct proceedings with contracting or subcontracting corporations in order to clear those corporations under the act, and that renegotiation proceedings would be conducted by the department or agency having the predominant interest in the business of the respective corporations. The third paragraph began as follows:

In order that your company and its affiliates, if any, may be assigned for renegotiation to the proper Department or Service with the minimum of inconvenience to all concerned, we will be glad to receive any information which you may care to submit bearing upon the matter.

It was stated in the remainder of the paragraph that the information should cover the petitioner's estimate of the total dollar amount of its contracts with each of the various Government agencies, similar estimates in regard to subcontracts, the amount of expansion of facilities furnished by Government agencies, information as to its affiliates, if any, and similar information in regard to their contracts and subcontracts, so that the assignment of all of the companies might be made to the same department or service and renegotiation proceedings conducted on a consolidated basis. The next paragraph stated that a suggested outline of reply was enclosed for the petitioner's convenience. The last two paragraphs of the letter were as follows:

The difficulty of giving promptly an exact statement of the matters above mentioned is recognized. Accordingly, it is to be understood that a general esti-

mate with respect to the amounts of contracts and subcontracts will suffice for the immediate purpose. Such information will in any case be received without prejudice to you.

The assignment of your company will be deferred for fifteen days following the date of this letter in order that you may have an opportunity to submit the information outlined above.

The last paragraph of the outline of reply attached to the letter was as follows:

The foregoing information is based on general estimates only. Its purpose is to indicate to you our view as to how this company and its affiliates should be assigned for renegotiation under Section 403 of Public Law No. 528, as amended, should such renegotiation be required.

The petitioner replied to the above communication by a letter dated May 27, 1943, in which it stated that the actual sales made by it, except those for which final payment had been made prior to April 28, 1942, amounted to $686,822. It then showed the total dollar value of its prime contracts and gave a breakdown by dollars and percentage showing the amount furnished to each service or department. It also gave similar information in regard to its subcontracts. The petitioner stated that the larger portion of its product, as shown by the figures, had been taken by the Quartermaster Corps. The letter did not give any other statistical information in regard to the contracts and subcontracts mentioned.

The petitioner heard nothing further on the subject of the renegotiation of its 1942 contracts until some time in 1944. Meanwhile, the Price Adjustment Board, pursuant to the information supplied in the petitioner's letter of May 27, 1943, assigned the petitioner, on September 27, 1943, to the Office of the Quartermaster General. The latter office, on December 31, 1943, forwarded the assignment to the New York Quartermaster Price Adjustment Section. The petitioner was not advised during 1943 of those assignments. The New York Quartermaster Price Adjustment District Office wrote to the petitioner on February 22, 1944, advising the petitioner that all renegotiations with it had been "delegated to this Service." The letter requested information on sheets which were furnished and stated that a meeting of representatives of both sides would be scheduled at a mutually convenient date. The letter did not state and the record does not show just what contracts or what year was to be the subject of the renegotiation. Later, the petitioner was advised that the review of the petitioner under the Renegotiation Act had been transferred to another service and that the financial information theretofore requested should be withheld until requested under the new assignment. The renegotiation of the petitioner for 1942 was finally reassigned to the Philadelphia Signal Corps Price Adjustment Section on July 21, 1944,

and that section, in August 1944, called upon the petitioner for, and the petitioner furnished to that section, "the information and financial data requested by that office for use by it in determining whether the contractor had earned excessive profits in the fiscal year ended December 31, 1942." A time for a conference was also fixed in August 1944. The unilateral determination by the Under Secretary of War dated March 27, 1945, was made as a result of the renegotiation commenced by the Philadelphia Signal Corps Price Adjustment Section in August 1944.

The petitioner contends that the renegotiation which resulted in the unilateral determination here being contested did not commence within the meaning of section 403 (c) (6), *supra*, during the calendar year 1943, but commenced at some time in 1944, at which time the Secretary was barred from commencing renegotiation proceedings for the period here in question. The respondent makes only one contention in opposition, and that is that the renegotiation was commenced within the meaning of the section by the letter of March 3, 1943. He argues that renegotiation proceedings, as contemplated in the Renegotiation Act, involve three steps: (1) investigation and ascertainment of facts from the contractor, (2) renegotiation and clarification of the facts ascertained, and (3) a determination of the amount of excessive profits and the issuance of the unilateral determination where the parties are unable to agree. He argues that the proceedings in this case commenced when the investigation started and was brought to the attention of the contractor by the letter of March 3, 1943, asking for the submission of information in regard to its contracts. The respondent argues that that letter, which started the machinery in motion, should be recognized as commencing the renegotiation proceedings.

Subsequent amendments of the law applicable only to later years provided that renegotiation proceedings would commence with a formal notice to the contractor. However, the statute applicable to the period here in question did not specify how the proceeding would commence. The "Joint Statement" of March 31, 1943, referred to above, contained a statement that renegotiation commences on the "date set by the department conducting renegotiation for the initial renegotiation conference." The respondent argues that that was an erroneous interpretation and was later corrected by a provision in a manual which stated "that renegotiation commences at the time the machinery of renegotiation is put in motion and an initial contact made with the contractor, either in person or through the mails, for the purpose of obtaining information which is to be used as a basis for the determination of excessive profits." The petitioner replies that the manual was

"restricted" to Government personnel engaged in renegotiation. So far as the record shows, it was not even in existence during the calendar year 1943. Even if we assume for the purpose of discussion that the quoted interpretation was a proper one, still it would not help the respondent in this case because no contact was made with the petitioner, either in person òr through the mails during 1943 "for the purpose of obtaining information which is to be used as a basis for the determination of excessive profits."

Section 403 (c) (1) authorized and directed the Secretary "to require the contractor or subcontractor to renegotiate the contract price." It is seen from this and from other provisions of the law that the contractor is to be a party to the renegotiation. Indeed one of the chief purposes of the renegotiation is to bring both parties into agreement upon the repricing and the amount of excessive profits under the former contract price to be returned to the Government. The renegotiating agencies of the Government have consistently recognized that an actual renegotiation does not commence until the contractor is at least notified that he is to join in the proceeding in some way. For example, that he is to come to a conference or is to furnish information in regard to his renegotiable business which will reveal whether or not he has realized excessive profits and the extent thereof. Although Congress did not specify how a renegotiation should commence under the 1942 amendment, nevertheless, it must have intended that a Secretary should give a contractor some fair, unequivocal, and unmistakable notice of the Secretary's intention to commence a renegotiation. It could not commence until the Secretary had done something to indicate to a reasonably intelligent contractor that it was to commence at that point. Not every communication from a Secretary to a contractor in which the subject of renegotiation might be mentioned would serve this purpose. A communication of that kind might be for another purpose, and a communication obviously intended for another purpose would not serve to commence a renegotiation.

The letter of March 3, 1943, upon which the respondent relies, was not sent for the purpose of commencing renegotiation proceedings. It was not sent for the purpose of bringing about an initial conference or to obtain information to be used as the basis for the determination of excessive profits. It was carefully written and its purpose is obvious. It sought some very limited information for assignment purposes only. It asked not for facts, but for estimates only. It said that the Price Adjustment Board would "be glad to receive" such information as the petitioner might care to submit. It explained that the information furnished would in no case prejudice the peti-

tioner, and the form enclosed indicated that no decision had yet been reached as to whether renegotiation would or would not be required. Not even estimates were requested as to costs and other information which would obviously be necessary in any renegotiation proceeding. The letter contains no suggestion that the Secretary is thereby requiring the petitioner to renegotiate the contract price of any of its contracts or subcontracts. Later communications required the petitioner to submit information to be used as a basis for the determination of excessive profits for 1942, but those communications were made in 1944 and not in 1943. Therefore, they were too late under the statute. It is not necessary in this case to determine exactly when the renegotiation in question did commence. It obviously commenced at some time in 1944, but it is sufficient for present purposes to hold that it did not commence in 1943.

It only remains to apply the above holdings to the facts in the present case. The renegotiation and the determination of the Secretary were based upon 225 contracts. It appears from admitted allegations of the petition that the total profits derived in 1942 from these contracts amounted to $167,722. The parties have stipulated, however, that only 212 of the above transactions were completed during 1942 and the other 13 contracts were not completed or terminated within that year. The record does not show the profits on the 13 contracts which were not completed. The statute of limitation barred renegotiation in regard to the 212 contracts which were completed during 1942, but it did not bar renegotiation in regard to the other 13 contracts which were not completed in that year. The question is to determine what part of the profits of 1942 on the 13 contracts which were not completed in that year was excessive. The parties have not dealt with this question. Since no better solution has been suggested, we shall devise one. The determination was made, as the respondent insists, on an "overall" basis and it would appear therefore that each dollar of profits represented a proportionate part of the total amount of excessive profits determined. If the 1942 profits on the 13 contracts were known, those profits could be assigned their proportionate part of the excessive profits determined on the total profits of $167,722. The parties are directed to file a computation in accordance with this opinion for the entry by the Court of an order showing the excessive profits on the 13 contracts, or otherwise move in respect to the case on or before July 31, 1946.

Reviewed by the Court.