SPRAY COTTON MILLS, PETITIONER, *v.* THE SECRETARY OF WAR, RESPONDENT.

Docket No. 239–R. Promulgated October 29, 1947.

*Meade C. Patrick, Esq.*, for the petitioner.
*Frederick N. Curley, Esq.*, for the respondent.

### OPINION.

TYSON, *Judge*: This is a proceeding for the redetermination of the amount, if any, of excessive profits realized by the petitioner

during the calendar year 1942. The Secretary of War determined that $47,500 of the profits realized by the petitioner during 1942 under subcontracts subject to renegotiation under the Renegotiation Act of 1942, as amended, were excessive. The only error assigned is that:

The Secretary [of War] erred in commencing renegotiation proceedings against the petitioner for the fiscal year ended December 31, 1942, after the period of limitations within which said proceedings might be properly commenced under the statute had expired.

All of the facts are presented in a stipulation and certain exhibits attached thereto. The facts as stipulated are adopted as the findings of fact herein. The pertinent facts are stated below.

The petitioner is a corporation, with an office and plant at Spray, North Carolina. It keeps its books on the accrual basis and uses the calendar year as its annual accounting period.

The petitioner is a producer of carded cotton yarns and sells its product to others for processing into fabrics. During the calendar year 1942, which is petitioner's fiscal year ended December 31, 1942, the petitioner sold yarns to various business enterprises. The petitioner made none of such sales on prime or direct contracts with any Government department or agency. It was either a subcontractor or sub-subcontractor within section 403 (c) (1) of the Renegotiation Act.

On December 31, 1943, in the process of examining data on the textile industry, the War Department learned for the first time that the petitioner had sold cotton yarns to business enterprises which either directly or indirectly may have been producing products which had a "war-end" use under the Renegotiation Act. This discovery indicated to the Department that the petitioner might have received excessive profits. The Quartermaster General's Office in Washington, on December 31, 1943, by telephonic communication, assigned the petitioner to the Price Adjustment District Office in Greenville, South Carolina, for the purpose of renegotiating the petitioner's excessive profits. Acting under this assignment, the Price Adjustment District Office in Greenville (hereinafter referred to as the District Office), on December 31, 1943, mailed to the petitioner by ordinary mail the following letter:

31 DECEMBER 1943.

SPRAY COTTON MILLS,
*Spray, North Carolina.*

DEAR SIRS: Pursuant to an Act of Congress (Section 403 of the Sixth Supplemental National Defense Appropriation Act of 1942, approved 28 April 1942, as amended by Section 801 of the Revenue Act of 1942, approved 21 October 1942) Price Adjustment Boards have been established within the War Department, the Navy Department, the Maritime Commission, the Treasury Department and other Government agencies. The function of these Boards is to review the profits earned on Government business by individuals or corporations who are parties to contracts for the production or supply of war products.

In the interest of simplicity, the four above-mentioned Departments have agreed that there should be delegated to this Section all renegotiations with your Company.

It is the view of the Board that this review can better be made by an overall study of your Company's financial position and your profits (past and prospective) from your war contracts as a whole, subdivided only as to fixed-fee and fixed-price contracts, than by an analysis of each individual contract on a unit cost basis.

To accomplish this there is inclosed herewith, a set of schedules suggesting the arrangement of required accounting and other data, which it is requested you furnish this office within the next thirty days.

Subsequent to a study of the information furnished this office arrangements will be made for a meeting with representatives of your firm on a mutually convenient date.

For the Quartermaster General:

Very truly yours,

Incl.                                        BOYCE F. MARTIN,
BFM: BC                          Captain, Q. M. C., Assistant.

The information requested by the letter of December 31, 1943, would have enabled the District Office to determine the amount, if any, of excessive profits received by the petitioner. The letter was received and read by the petitioner's president on January 1, 1944, when he went to the Spray post office and opened the petitioner's post office box. The letter was not in the post office box at any time on December 31, 1943, when the petitioner's agents customarily opened the box after each delivery of incoming mail on that day. The petitioner did not receive any communication from any agency of the Federal Government regarding renegotiation for the calendar year 1942 prior to receipt of the letter of December 31, 1943.

On January 5, 1944, the petitioner, in reply to a letter from the District Office dated January 4, 1944, informed that office that its fiscal year ended on December 31 and that 1942 was the latest year for which it had closed its books. The respondent had no knowledge prior to January 5, 1944, regarding the accounting method and the accounting period used by the petitioner in keeping its books.

Neither during the calendar year 1943 nor at any time prior thereto did the petitioner submit any information or in any manner indicate to any Government department, officer, or agency that it was a producer of yarns or was doing business with anyone whose business had a "war-end" use; nor did it ever indicate to any Government department, officer, or agency that it was a contractor or subcontractor within the Renegotiation Act.

The petitioner acknowledged receipt of the letter of December 31, 1943, on February 22, 1944, and between the latter date and December 4, 1944, it corresponded with the District Office regarding the submission of the information requested.

In this correspondence the petitioner, in its letter of February 22, 1944, acknowledging receipt of the letter of December 31, 1943, stated

that delay in submitting the information requested was due to illness in its office and explained that, because of a shortage of help and the complexity of the matter, it had engaged A. M. Pullen & Co., independent accountants, to prepare and file the information. The District Office in April 1944 sent the petitioner forms for use in submitting information in connection with renegotiation for the year 1943; and in May 1944 the petitioner notified the District Office that A. M. Pullen & Co. would complete and file the forms for 1943. In a letter to the District Office dated May 11, 1944, the petitioner stated that its attorneys had advised it that the letter of December 31, 1943, received by it after that date, was not the commencement of the renegotiation proceeding within one year from the close of 1942; and it asserted that it was not liable to renegotiation on 1942 business. The District Office, by letter of May 12, 1944, replied that the Price Adjustment Board "On previous matters pertaining to the running of the statute of limitations" had interpreted section 403 (c) (6) as meaning that "renegotiation commences at the time proceedings are instituted to obtain the information which is to be used as a basis for the determination of excessive profits." The letter of May 12, 1944, stated that renegotiation for 1942 was not barred, and again requested that the information for that year be submitted. The petitioner requested a review by the War Department Price Adjustment Board in Washington of the ruling that renegotiation for 1942 was not barred, and, on July 12, 1944, it received notice from the District Office that, upon review, that Board had held that the renegotiation for 1942 had been commenced in time, and that the Board had instructed the District Office to proceed in the matter. By letter of July 25, 1944, the District Office again requested petitioner to submit the information desired. By letter of July 25, 1944, the petitioner requested the District Office to hold the renegotiation for 1942 in abeyance until its attorneys could complete a further inquiry into the matter of the petitioner's liability to renegotiate. By letter of August 18, 1944, the petitioner informed the District Office that, upon the advice of its attorneys, it would submit the information, but that it would do so under protest. It also stated that because of illness of personnel there would be some delay in forwarding the information. By letter of October 30, 1944, the District Office inquired as to when the information might be expected, stating that it had learned from A. M. Pullen & Co. by telephone that the forms necessary for renegotiation for the years 1942 and 1943 had been completed by them, and would be forwarded upon inspection and approval by the petitioner. The completed forms for 1943 were forwarded by petitioner to the District Office on November 13, 1944, and, on November 14, 1944, the petitioner by letter informed the District Office that it was still gathering information necessary to complete the forms

for 1942. On November 21, 1944, the petitioner by letter notified the District Office that it had obtained most, but not all, of the information required for the 1942 forms, and expressed the view that the District Office must have misunderstood A. M. Pullen & Co. in stating in October that such forms were completed at that time. The information and forms for the year 1942 were finally forwarded to the District Office on December 4, 1944, with a letter of the petitioner stating that it adhered to its position that the renegotiation proceedings for 1942 were not commenced within the period of limitations, and that it was submitting the information under protest.

On December 21, 1944, the District Office wrote the petitioner, setting January 24, 1945, as the date for the initial conference for renegotiation of the petitioner for the year 1943. It did not send the petitioner any formal notice setting a conference date for renegotiation for the year 1942. However, during the conference on January 24, 1945, the existence of excessive profits for the year 1942 was discussed and a refund of $47,500 by the petitioner, representing excessive profits earned in the year 1942, was proposed by the District Office. The War Department Price Adjustment Board thereafter, on June 21, 1945, made a unilateral determination of excessive profits for the year 1942 in the amount of $47,500. The determination was embodied in an order dated June 21, 1945, but such order has not been embodied in any agreement with the petitioner. The amount of $47,500, after allowance for the tax credit provided by section 3806, Internal Revenue Code, was paid by the petitioner under protest on August 9, 1945.

The aforementioned renegotiation proceedings and renegotiations were conducted on an "over all" basis of the petitioner's renegotiable sales for the year 1942, under section 403 (c) (1) of the Renegotiation Act of 1942, as amended.

In a "Joint Statement by the War, Navy and Treasury Departments and the Maritime Commission of Purposes, Principles, Policies, and Interpretations" [1] relative to the Renegotiation Acts, which was promulgated on March 31, 1943, it was stated with regard to section 403 (c) (6) that:

The Departments interpret this provision to mean that renegotiation commences on the specific date set by the Department conducting renegotiation for the initial renegotiation conference unless otherwise agreed by the contractor.

Shortly after publication of the "Joint Statement" containing the above quoted interpretation, and on May 27, 1943, the executive departments, concluding that they had erroneously construed section 403

---

[1] In a preface to the "Interpretations," it was stated that the construction of the statute set forth in the statement represented the present opinion of the departments; that the constructions were subject to revision from time to time as might appear desirable as a result of the operation of the various boards under the statute; and that the constructions were subject to change without notice.

(c) (6), and according to their custom, amended that interpretation, the amendment reading as follows:

The Departments interpret this provision to mean that renegotiation commences at the time of the institution of proceedings to obtain the information which is to be used as a basis for the determination of excessive profits.

This latter interpretation apparently represented the viewpoint of the Departments from May 27, 1943, to May 12, 1944, as it was quoted in the letter of the District Office to the petitioner of May 12, 1944, as representing the viewpoint of the Price Adjustment Board and as having been applied on previous "matters pertaining to the running of the statute of limitations."

The amendment of May 27, 1943, was not publicly announced or released, but was included in a manual furnished to Government personnel engaged in the administration of the renegotiation law and it was the practice of the agencies to quote therefrom in negotiations with contractors and subcontractors and to advise them of the contents of specific interpretations contained therein which were pertinent to the particular proceedings, and this practice was followed in the instant case.

Section 403 (c) (6) of the Renegotiation Act, as amended by section 801 of the Revenue Act of 1942, provides as follows:

No renegotiation of the contract price pursuant to any provision therefore, or otherwise, shall be commenced by the Secretary more than one year after the close of the fiscal year of the contractor or subcontractor within which completion or termination of the contract or subcontract, as determined by the Secretary, occurs.

The question is whether renegotiation was commenced by the Secretary within one year after the close of the fiscal year within which completion of petitioner's contracts ocurred. The petitioner made renegotiable sales in its fiscal year ended December 31, 1942, some of which were made under contracts completed in 1942, and some of which were made under contracts completed in 1943. The petitioner contends that the renegotiation is commenced on the specific date set for the initial renegotiation conference, and, as a specific date was never set for such a conference covering renegotiable sales of the fiscal year ended December 31, 1942, and, as the only conference at which such sales were discussed was held an January 24, 1945, the proceeding covering all of the renegotiable sales of such fiscal year is barred.[2]

---

[2] The gross sales of 1942 which were subject to renegotiation amounted to $809,619.06 $630,834 was attributable to contracts completed in 1942, and $178,785.06 was attributable to contracts not completed within 1942. However, all contracts subject to renegotiation and not completed in 1942 were completed in 1943. In reporting its 1942 sales to the District Office, the petitioner inadvertantly omitted sales of $34,420.26 which were subject to renegotiation. The total 1942 sales shown above include the sales so omitted from the report. The parties have stipulated that adjustment of the refund of $47,500 to reflect the sales so omitted results in the determination of $50,000 as the proper and correct amount of excessive profits on the corrected total of renegotiable sales.

In the event we disapprove its contention just mentioned, petitioner further contends, in the alternative, that the renegotiation commenced on January 1, 1944, the date of its receipt of the letter of the District Office dated December 31, 1943, and that the proceeding is therefore barred.

The respondent contends that the mailing of the letter of the District Office dated December 31, 1943, in which the petitioner was requested to submit financial and accounting data which would have enabled respondent to determine the amount, if any, of excessive profits received by the petitioner, was a commencement of the renegotiation; and, as the letter was mailed on December 31, 1943, renegotiation was commenced in time.

In support of its contention that renegotiation is commenced on the date set for the initial renegotiation conference, the petitioner asks us to follow the administrative interpretation of the statute made on March 31, 1943, by the executive departments charged with the duty of carrying out the Renegotiation Act.

Administrative practice has peculiar weight when it involves a contemporaneous interpretation of a statute by the men charged with the responsibility of setting its machinery in motion. *Norwegian Nitrogen Products Co.* v. *United States*, 288 U. S. 294, 315. Great weight is properly to be given to the interpretation consistently, through a long continued practice, given to it by the executive department charged with its administration. *United States* v. *Jackson*, 280 U. S. 183, 193; *Pressed Steel Tank Co.*, 46 B. T. A. 52, 59. But this latter rule does not apply where the interpretation is not doubtful. *United States* v. *Mo. Pac. R. Co.*, 278 U. S. 269, 280. The petitioner can derive no aid from these principles, for the courts are not justified in yielding to an administrative interpretation which has been neither uniform nor of long standing, *Alexander* v. *Cosden Co.*, 290 U. S. 484, 498; *Burnet* v. *Chicago Portrait Co.*, 285 U. S. 1, 16; *United States* v. *Mo. Pac. R. Co., supra; Iselin* v. *United States*, 270 U. S. 245, except to the extent that it is supported by valid reasons. *Burnet* v. *Chicago Portrait Co., supra.* The initial administrative interpretation of March 31, 1943, having been in effect not exceeding a month and 27 days at most, and, having been repudiated by the Departments 7 months prior to taking any action respecting this petitioner, and, not being in accord with the plain terms of the statute as we hereinafter interpret it, we must decline to follow the initial administrative interpretation contended for by petitioner. We are not impressed by petitioner's argument that the respondent should be bound by the initial administrative interpretation of March 31, 1943, because that was the only one that was published and it was never publicly revoked.

In support of its alternative contention the petitioner says that, in *J. H. Sessions & Son*, 6 T. C. 1236, this Court indicated that the statute contemplates something more than mere action by the Secretary—that it contemplates, and necessitates as well, that contact be had with the contractor and that he þe notified in some way that he is to join in the proceeding. Petitioner contends that such contact did not occur until January 1, 1944, upon its receipt of the letter of December 31, 1943, and therefore more than one year after the close of the year 1942, and it insists that the proceeding is consequently barred at least with respect to its renegotiable sales of 1942 attributable to contracts completed in 1942.[3]

In the Federal courts, and in the courts of many of the states (including Massachusetts, Mississippi, and Ohio) it is held that a suit or civil action is commenced, for the purposes of the statute of limitations, when the complaint is filed and process is ordered or delivered to an officer with the bona fide intent to have it served on the defendant, although actual service on the defendant is not had until after, the limitation period has expired. *Linn Timber Co.* v. *United States,* 236 U. S. 574, 578, and cases cited; *Isaacks* v. *Jeffers*, 144 Fed. (2d) 26; certiorari denied, 323 U. S. 781; *United States* v. *Spreckels*, 50 Fed. Supp. 789; *Westminster National Bank* v. *Graustein*, 270 Mass. 565; 170 N. E. 621; *Shaffer* v. *Shaffer* (Ohio Appeal), 42 N. E. (2d) 176; *Swalm* v. *Sauls*, 106 So. 775; 141 Miss. 515. If, in the ordinary meaning of the word "commence," the filing of the complaint with direction for service on the defendant is enough to stop the running of the statute of limitations, and actual service upon the defendant is not essential to commencement of a civil action in a court, it would seem, with equal or greater reason, that, in this case, the preparation of the letter requesting information which would have enabled the District Office to determine the amount, if any, of the excessive profits realized by petitioner and the placing of it in the hands of the post office for delivery in usual course to the petitioner was enough to constitute a "commencement by the Secretary," and that receipt of the letter by the petitioner is not essential to commencement. The receipt of notice by the petitioner is a thing entirely apart from the commencement of the proceeding by the Secretary. Delivery of the letter by the post office is not an act of the Secretary, and, by the plain terms of the statute, it is an act of the Secretary which commences the proceeding; since the statute says, the proceedings "shall be commenced by the Secretary." If Congress had intended that no renegotiation should

---

[3] The parties have stipulated that if the proceeding was commenced in time only with respect to renegotiable sales of 1942 attributable to contracts completed in 1943, which amounted to $178,785.06, a determination of excessive profits on such sales in the amount of $11,041.31 is proper.

be commenced more than one year after the receipt of notice by the contractor it could have said so in apt language.

The argument of the petitioner on its alternative contention, that this Court construed the statute in the *Sessions* case as meaning that contact (the contact here claimed being receipt of the letter of December 31, 1943, by petitioner) with the contractor is essential to commencement of the renegotiation, is without merit. In that case the respondent contended that the departmental interpretation contained in the "Joint Statement" of March 31, 1943, that renegotiation commences on the date set for the initial renegotiation conference was erroneous, and he sought to apply a claimed later interpretation in a manual, which stated "that renegotiation commences at the time the machinery of renegotiation is put in motion and an initial contact made with the contractor, either in person or through the mails, for the purpose of obtaining information which is to be used as a basis for the determination of excessive profits." In disposing of this contention this Court did not hold that the claimed later interpretation was proper, or that the statute required that there be contact with the contractor before renegotiation could be said to have commenced. On the record before it, this Court could not find that such interpretation was in existence during the year in question, and it assumed such interpretation as a proper one merely for the purpose of discussion of the respondent's contention. The contention was rejected not because of failure to contact the contractor in person or through the mails, but because of the fact that the letter sent to the contractor, upon which the respondent relied, had nothing in it to indicate that it was "for the purpose of obtaining information which is to be used as a basis for the determination of excessive profits," as required by the interpretation which was assumed to have been proper. We find nothing in the *Sessions* case which is controlling or contra here. The letter there under consideration did not request information to be used as a basis for the determination of excessive profits, as did the letter here. The letter there merely sought information for the purpose of assigning the contractor to the proper Department, and it contained no suggestion that the Secretary, by the letter, was requiring the contractor to renegotiate. We reject the alternative contention of petitioner.

We agree with the contention of respondent that renegotiation commenced when the letter of the District Office was mailed on December 31, 1943, and that, therefore, the renegotiation was timely commenced.

The Renegotiation Act authorizes the Secretary, whenever he is of the opinion that the profits realized or likely to be realized from any contract with his Department may be excessive, "to require the contractor * * * to renegotiate the contract price." Sec. 403 (c) (1).

It defines "renegotiation" as "including the refixing by the Secretary of the Department of the contract price." Sec. 403 (a) (3). There are provisions in section 403 (c) (5) relating to proceedings which are initiated by the contractor by voluntarily filing information with the Secretary, but with these we are not concerned. The limitation prescribed by section 403 (c) (6) relates to renegotiations "commenced by the Secretary," and this proceeding is of that type. As to such renegotiation proceedings, the statute contains no direction to the Secretary concerning formalities to be observed by him or the manner in which the proceeding shall be commenced and carried to final determination.. The facts in the present case show that the course pursued was the exchange of communications between the District Office and the petitioner through the United States mail; that no date was set for a conference or hearing; that, after the information had been submitted, the matter was brought up at an initial conference held on January 24, 1945, for the renegotiation of petitioner's fiscal year ended December 31, 1943, and during such conference existence of excessive profits for the fiscal year ended December 31,' 1942, was discussed and a refund of $47,500 by petitioner representing excessive profits for the latter year was proposed by the District Office; and that such amount was later fixed in the resultant order of June 21, 1945. There was, in fact, a renegotiation, and the question is: When, in the particular proceeding here under consideration, did the Secretary commence the renegotiation?

"Unless the contrary appears, statutory words are presumed to be used in their ordinary and usual sense, and with the meaning commonly attributable to them." *DeGanay* v. *Lederer*, 250 U. S. 376, 381. There is nothing in the statute to indicate that Congress intended to use the word "commenced" in other than its ordinary and usual sense. The ordinary meaning of "commence" is "to have or make a beginning; to originate; start; begin." It is identical in meaning with "begin." And the ordinary meaning of "begin" is "to do the first act or the first part of an action; to enter upon or commence some course or operation; to take the first step; to start." Webster's New International Dictionary, 2d Ed. The questions then are: When, in this renegotiation proceeding, did the Secretary make a beginning, perform the first act, or take the first step toward refixing the contract price? When did he first perform an act which was adequate to bring in the contractor as a party to a proceeding which would lead to a determination by the Secretary respecting excessive profits?

The letter of December 31, 1943, from the District Office can not be characterized as a step preliminary to renegotiation; that is, an inquiry intended to gather general information or estimated figures, to be used in assigning the contractor to an agent of the Secretary

for the purpose of renegotiation, and to be submitted without prejudice to the rights of the contractor, as was the letter in the *Sessions* case. On the contrary, it was a notice of the decision of the Secretary to renegotiate and a demand upon the contractor for the specific information upon the basis of which a determination of excessive profits could be made. It notified the petitioner that all renegotiations respecting its contracts had been assigned to the District Office, that the Price Adjustment Board had determined that a "review" of the petitioner's profits should be made by an "over all study" of the petitioner's financial position and its profits from war contracts as a whole; and it requested the petitioner within thirty days to submit, on enclosed schedules, accounting and other data "to accomplish" a review of such profits. When this letter was deposited in the mail for transmission to the contractor at its place of business, the Secretary, acting through the District Office, took the first step or action which set the machinery of renegotiation in motion, and this, we think, was the commencement of renegotiation by the Secretary, as contended by respondent. Cf. *Stein Brothers Mfg. Co.* v. *Secretary of War*, 7 T. C. 863, 873, 875.

We are of the opinion that the renegotiation in the present case was commenced by the Secretary on December 31, 1943, and that the proceeding with respect to all renegotiable sales of the fiscal year ended December 31, 1942, is not barred under the provisions of section 403 (c) (6), *supra*. In accordance with the stipulation of the parties, an order will be entered finding that $50,000 is the proper and correct amount of excessive profits.

Reviewed by the Court.

*An order will issue in accordance herewith.*

KERN, *J.*, dissents.

––––––––––

HARRON, *J.*, concurring: In the *Sessions* case, the letter which was sent to the contractor was an entirely different letter than the letter which was sent to the petitioner before us here. Cf. p. 1241 of the report of the *Sessions* case. The holdings in the *Sessions* case are not controlling of the question here. However, reference is made in the *Sessions* case, at page 1243, to "a manual" and an interpretation contained therein of section 403 (c) (6) of the Renegotiation Act, which interpretation is quoted. The majority opinion in this case also refers to "a manual." It would throw some light on the problem if the "manual" were identified, and if the duration of the amended interpretation was better understood.

The manual is the Joint Renegotiation Manual, effective January 27, 1944, which was followed by the "Departments" in the renegotiation of contracts and subcontracts with respect to renegotiation for

fiscal years ended on or prior to June 30, 1943. Paragraph 101.3 of section 1 of the Joint Renegotiation Manual provides that: "(2) This manual supersedes the 'Joint Statement by the War, Navy and Treasury Departments and the Maritime Commission, dated March 31, 1943 * * *.'"

Section 342.2 of the Joint Renegotiation Manual is as follows:

342.2 Commencement of Renegotiation. Subsection (c) (6) of the Act is interpreted to mean that renegotiation commences at the time the machinery of renegotiation is put in motion and an initial contact made with the contractor, either in person or through the mails, for the purpose of obtaining information which is to be used as a basis for the determination of excessive profits.

(See p. 1243, report of *J. H. Sessions & Son, supra,* where the above provision is quoted.)

The interpretation of the word "commenced" in section 403 (c) (6), set forth in Part III of the Joint Statement dated March 31, 1943, was amended and superseded by the amendment of May 27, 1943, *supra*. It appears that the amended interpretation of May 27, 1943, was not changed thereafter, in substance. Comparison with section 342.2 of the Joint Renegotiation Manual shows that both contain the clause "to obtain [of obtaining] information which is to be used as a basis for the determination of excessive profits." Section 342.2 of the Joint Manual is a paraphrasing of the statement of May 27, 1943; but if it is more than a paraphrasing, then it is only fair to note that the statement of May 27, 1943, was in effect until January 27, 1944.

The Joint Renegotiation Manual was not published in the Federal Register, as far as can be ascertained. (Renegotiation Regulations for fiscal years ending after June 30, 1943, were published in the Federal Register of April 19, 1944, p. 4135. See Code of Federal Regulations of the U. S. A., Title 32, 1944 Supp., ch. XIV, p. 2835.) But it has been made available to the libraries of various governmental agencies, including the library of this Court, and, as the majority opinion states, it was quoted to contractors in negotiations with them, and it represented the compilation of the uniform rules of the Departments administering the Renegotiation Act.

I concur in the view that the Departments and the Secretaries interpreted section 403 (c) (6) in the manner set forth in the Joint Statement only during the brief period of March 31 to May 27, 1943, and that, thereafter, the amendment of May 27, 1943, represented the interpretation uniformly followed in all renegotiation relating to fiscal years ended prior to June 30, 1943. I would add that section 342.2 of the Joint Renegotiation Manual is substantially the same as the statement of May 27, 1943. Thus, I think it is demonstrated that the amendment of May 27, 1943, of the first interpretation in the Joint Statement should control the question in this case because, of the two

interpretations, it was the only interpretation which had long standing and uniform application. *Alexander* v. *Cosden Co., supra.* It can not be said to represent a mere "interim" interpretation.

If the fact that the interpretations in the published Joint Statement were "published" is to be a factor of great weight, then all interpretations in the Joint Renegotiation Manual itself, as well as interpretations followed before the compilation of the Joint Manual, must be given no weight, whatever. It appears that, except for the Joint Statement (which was, in part, a public statement explaining the purposes and history of the Renegotiation Act), the administrative procedures of the Departments followed in the renegotiation of the years ended before June 30, 1943, were not published. I can not find any legal basis for a view that the Departments must be held to any or all of the interpretations set forth in the Joint Statement, regardless of subsequent amendments, solely because the Joint Statement was published and amendments were not. The interpretations in the Joint Statement were stated to be subject to revision from time to time.

---

ARUNDELL, J., dissenting: While Congress, in section 403 (c) (6) of the Renegotiation Act, as applicable to the year before us, provided that "No renegotiation * * * shall be commenced by the Secretary more than one year after the close of the fiscal year of the contractor * * *," it did not spell out in that section what it meant by the commencement of renegotiation. In section 403 (c) (5), however, there is a good indication of what Congress had in mind. That section reads as follows:

(5) Any contractor or subcontractor who holds contracts or subcontracts, to which the provisions of this section are applicable, may file with the Secretaries of all the Departments concerned statements of actual costs of production and such other financial statements for any prior fiscal year or years of such contractor or subcontractor, in such form and detail, as the Secretaries shall prescribe by joint regulation. Within one year after the filing of such statements, or within such shorter period as may be prescribed by such joint regulation, the Secretary of a Department may give the contractor or subcontractor written notice, in form and manner to be prescribed in such joint regulation, that the Secretary is of the opinion that the profits realized from some or all of such contracts or subcontracts may be excessive, *and fixing a date and place for an initial conference to be held within sixty days thereafter.* If such notice is not given *and renegotiation commenced by the Secretary within such sixty days* the contractor or subcontractor shall not thereafter be required to renegotiate to eliminate excessive profits realized from any such contract or subcontract during such fiscal year or years and any liabilities of the contractor or subcontractor for excessive profits realized during such period shall be thereby discharged. [Italics supplied.]

In that context the tie-in between "an initial conference" and the commencement of renegotiation is obvious. Thus, in the "Joint Statement" of March 31, 1943, the Departments charged with the adminis-

tration of the Renegotiation Act announced to the public that they interpreted the statute to mean that "renegotiation commences on the specific date set by the Department conducting renegotiation for the initial renegotiation conference." In my opinion, that is the proper interpretation of the statute, and the later unpublished amendment of May 27, 1943, which in effect is adopted by the majority, is the erroneous interpretation.

Furthermore, it appears that the Departmental interpretation represented by the amendment of May 27, 1943, was itself only temporary. In *J. H. Sessions & Son* v. *Secretary of War*, 6 T. C. 1236, which, like this case, involved the calendar year 1942, the respondent relied on still a third and later Departmental interpretation to the effect "that renegotiation commences at the time the machinery of renegotiation is put in motion and an initial contact made with the contractor, either in person or through the mails, for the purpose of obtaining information which is to be used as a basis for the determination of excessive profits." Even under that interpretation, the instant renegotiation was not timely, because the petitioner received no communication from, and was not contacted by, the renegotiating authorities in 1943. I think the interim unpublished interpretation of May 27, 1943, is entitled to no weight whatever.

The only step relied upon by the respondent is the mailing of the Quartermaster General's letter of December 31, 1943, which the petitioner did not receive until 1944. The letter is little more than a request for information to be used in determining whether or not to renegotiate. It does not even purport to set a date for a conference. Surely, it was never contemplated that renegotiation should commence any time a Secretary might write a contractor for information. As we said in the *Sessions* case, "Although Congress did not specify how a renegotiation should commence under the 1942 amendment, nevertheless, it must have intended that a Secretary should give a contractor some *fair*, *unequivocal*, and *unmistakable notice* of the Secretary's intention to commence a renegotiation." [Italics added.]

Finally, although not controlling in the year before us, I would point out that the letter relied upon would not even be sufficient to constitute the commencement of renegotiation under the act as amended in 1943, which requires that a formal notice setting a time and place for a conference be sent to the contractor by registered mail. See section 403 (c) (1) of the Renegotiation Act, as amended by section 701 (b) of the Revenue Act of 1943. In my opinion it is also insufficient for such purpose under a proper interpretation of the law as applicable to the year 1942, and I therefore dissent.

VAN FOSSAN, *J.*, agrees with this dissent. ·