MORGAN CONSTRUCTION COMPANY, PETITIONER, *v.* THE SECRETARY OF WAR, RESPONDENT.

Docket No. 143–R. Promulgated November 4, 1948.

*Joseph I. Worsham, Esq.*, and *Joseph A. Worsham, Esq.*, for the petitioner.

*Frederick N. Qurley, Esq.*, and *William V. Crosswhite, Esq.*, for the respondent.

OPINION.

HARLAN, *Judge*: Petitioner contends (1) that the application of the Renegotiation Act to a contract executed before enactment of the act, where the contract contains no provision for renegotiation and performance had begun, constitutes a taking of property without due process of law in violation of the Fifth Amendment to the Constitution of the United States, and (2) that the Renegotiation Act is unconstitutional in that it improperly delegates power to an administrative official in authorizing him to determine what constitutes excessive profits, without providing any reasonable standard to guide the exercise of such power. On brief petitioner does not argue those contentions, and recognizes the fact that this Court has held that the Renegotiation Act is constitutional, both in its prospective and retrospective applications. *Stein Brothers Manufacturing Co.* v. *Secretary of War*, 7 T. C. 863; *Ring Construction Corporation* v. *Secretary of War*, 8 T. C. 1070; *National Electric Welding Machines Co.* v. *Secretary of War*, 10 T. C. 49. The Supreme Court of the United States, on June 14, 1948, held to the same effect in *Lichter* v. *United States*, 334 U. S. 742. The Renegotiation Act is constitutional as applied to petitioner.

In its petition, petitioner alleges that the respondent's determination of excessive profits was erroneous because contrary to and in violation of the express provision of section 403 (i) (1) (E) of the Renegotiation Act exempting from renegotiation contracts with a Department awarded as the result of competitive bidding for the construction of any building, structure, improvement, or facility. Petitioner's brief contains no reference to or any argument in support of this assignment of error, and presumably petitioner has waived or abandoned it. The provision relied upon became part of the Renegotiation Act in 1943 and, inasmuch as it was not made retroactive, it has no application to the year 1942, which is involved in this proceeding.

Petitioner next contends that, having in the course of the performance of its contract produced a natural deposit and processed it to and beyond the first form suitable for industrial use, it is entitled, for the purpose of renegotiation, to a cost allowance substantially equivalent to its sale or market price.

In support of this contention petitioner urges that Congress did not intend to provide for the renegotiation of profits realized from the quarrying and crushing of stone, and expressly exempted such products

in section 403 (i) (3) of the Renegotiation Act of 1943, which was made retroactive to the year 1942 here involved. This section and section 403 (i) (1) (ii) of the Renegotiation Act of 1942, hereinafter discussed, are set forth in the margin.[1]

The respondent contends that section 403 (i) (3) was enacted solely to protect the owners of wasting or depleting assets, and, therefore, has no application to petitioner, which never owned or had any property interest in the limestone in question.

Section 403 (i) (3), upon which petitioner relies, supplements section 403 (i) (1) (ii) of the Renegotiation Act of 1942, which provides for the exemption from renegotiation of contracts or subcontracts for the product of a mine which had not been processed, refined, or treated beyond the first form or state suitable for industrial use. A joint regulation issued under date of February 1, 1943, by the Departments named in the Renegotiation Act of 1942, interpreting and applying section 403 (i) (1) (ii), listed a number of products which were exempted thereunder, one of which was "Aggregates consisting of washed or screened sand, gravel or crushed stone." Petitioner is not entitled to the benefits of this section because it did not have a contract or subcontract for the product of a mine.

The purpose of section 403 (i) (3) was to place producers of mineral products who processed, refined or treated such products to and beyond the first form or state suitable for industrial use in a position comparable to producers who sold their products at the exempt stage.[2]

---

[1] SEC. 403 (i) [Renegotiation Act of 1943]. * * *

* * * * * * *

(3) In the case of a contractor or subcontractor who produces or acquires the product of a mine, oil or gas well, or other mineral or natural deposit, or timber, and processes, refines, or treats such a product to and beyond the first form or state suitable for industrial use, or who produces or acquires an agricultural product and processes, refines, or treats such a product to and beyond the first form or state in which it is customarily sold or in which it has an established market, the Board shall prescribe such regulations as may be necessary to give such contractor or subcontractor a cost allowance substantially equivalent to the amount which would have been realized by such contractor or subcontractor if he had sold such product at such first form or state. * * *

SEC. 403 (i) [Renegotiation Act of 1942]. * * *

* * * * * * *

(1) The provisions of this section shall not apply to—

* * * * * * *

(ii) any contract or subcontract for the product of a mine, oil or gas well, or other mineral or natural deposit, or timber, which has not been processed, refined, or treated beyond the first form or state suitable for industrial use; and the Secretaries are authorized by joint regulation, to define, interpret, and apply this exemption.

[2] "* * * Consequently, * * * at the suggestion of the departments, there has been added a provision expressly authorizing the making of appropriate cost allowances in the case of an integrated producer who processes an exempted product up to and beyond the first form or state suitable for industrial use in order to place such producer in a position comparable with that of other producers who sell such products." (Senate's Report Accompanying H. R. 3687, 78th Cong., 1st sess., dated Dec. 22, 1943, p. 35.)

"To insure the equitable treatment of contractors or subcontractors producing minerals, oil or gas, or timber, and who process, refine, or treat such products to or beyond the first form or state suitable for industrial use, * * * the Board is required to prescribe such regulations as may be necessary to give the contractor or subcontractor a cost allowance substantially equivalent to the amount which would have been realized by him if he had sold such products in their first form or state." (Report of the House Committee on Ways and Means, Nov. 18, 1943, 78th Cong., 1st sess., pp. 81, 82.)

As originally submitted to the Senate Committee on Finance, this section provided that this relief be given to producers who processed an exempted product "to *or* beyond the first form or state" at which the exemption terminated, but this was changed to read "to *and* beyond," so that it "would not apply to a producer who purchased the product at the exempted stage at a cost which might vary materially from the market value at the time of its use." See Ex. A, "Data on Renegotiation of Contracts, Dec. 9, 1943, printed for use of Committee on Finance, United States Senate."

Because of its retroactive application, the regulation interpreting and applying section 403 (i) (3) is contained in the joint renegotiation manual for the fiscal years ended on or prior to June 30, 1943, issued by the various Departments named in the Renegotiation Act of 1942. It provides as follows:

343.4 Cost Allowance for Raw Materials and Agricultural Commodities in the Case of Integrated Producers.

\* \* \* \* \* \* \*

(2) Interpretation and Application. Where a contractor (a) processes, re fines, or treats a product of a mine, oil or gas well, or other mineral or natural deposit, or timber, to the first form or state suitable for industrial use, and further refines, processes or treats such product beyond the first form or state suitable for industrial use in order to perform his contract, or (b) produces or acquires an agricultural product and processes, refines or treats such agricultural product to and beyond the first form or state in which it is customarily sold or in which it has an established market, then in such cases for the purposes of statutory renegotiation the product will be treated as an item of cost of the performance of such contract in such amount as, in the opinion of the Board, fairly represents a properly applicable allowance. In determining the proper allowance, due consideration shall be given to the established sale or market price where there is a representative market for the product in the exempt state, and to such other factors as may be necessary to reflect the purpose and intent of the statutory exemption. In general it is the purpose and intent of this provision to allow to the contractor engaged in an integrated process of the type described, an item of cost substantially equivalent to that granted by the statute to others who sell an exempt product, namely what he could have realized if he had sold the exempt product at the intermediate stage.

On brief petitioner argues that it quarried and crushed stone and that such "an operation is obviously a processing or treatment, and that it brings the stone to its first state suitable for industrial use is shown by the fact that certain companies make a business of quarrying and crushing stone and then selling it in such form." Inasmuch as the regulations heretofore quoted provide in effect that quarrying and crushing stone brings it to the exempt stage, we agree with petitioner. Merely producing and bringing stone to the exempt stage does not, however, entitle petitioner to the cost allowance provided for in section 403 (i) (3). In order to qualify for this allowance, the burden was on petitioner to prove also that it was an integrated producer who processed, refined, or treated a mineral product beyond

the first form or state for industrial use. It has not met this burden. It had no contract calling upon it to supply a mineral product processed, refined, or treated beyond the exempt stage. Its contracts were for the construction of roads and sidewalks at Camp Hood. All that it did, and all that its contracts required it to do, after it produced the crushed stone was to haul it to Camp Hood and use it in the construction of roads and sidewalks. This use of crushed stone can not be classified as processing, refining, or treating it beyond the first form or state *suitable for* industrial use. It is in fact *the industrial use* for which the stone was intended.

Although this, without more, is sufficient to justify the denial to petitioner of the cost allowance claimed, it may not be amiss to point out that we think there is another and equally sound reason why petitioner can not prevail. A study of section 403 (i) (3), its legislative history, and the above quoted regulation discloses that its purpose was to give an integrated producer of a mineral product who processed, refined, or treated it to and beyond the exempt stage a cost allowance equivalent to what such a producer could have received *if he had sold the mineral product at the exempt stage.* It is quite apparent, therefore, that Congress had in mind a producer who had such a property interest in the mineral product that he could have sold it at the exempt stage. Petitioner was not such a producer. At the time it and others bid for the Camp Hood construction contracts, they were advised by the War Department that the successful bidder could use without charge stone located on Government-owned lands adjacent to Camp Hood. All of the stone used in the performance of the contracts here involved was extracted from these lands. The right given to petitioner to use this stone did not include the right to sell it at the exempt stage, and the small sales of crushed stone made by petitioner and mentioned in our findings were made at the request of and pursuant to permission granted by the Government. Inasmuch as petitioner had merely the right to use the stone in the performance of Government contracts for roads and sidewalks at Camp Hood, and did not have a property interest therein which permitted it to sell the stone at the exempt stage, it is not entitled to the cost allowance provided for in section 403 (i) (3). This conclusion gives a rational construction to a statutory provision which was intended to provide an incentive to increase production to integrated producers of mineral products needed in the war effort and not to producers such as petitioner, who were permitted to mine and use without charge only so much of a mineral located on Government-owned lands as was necessary to enable them to complete construction contracts.

In view of the conclusion reached, we deem it unnecessary to decide the amount of the cost allowance petitioner would have been entitled to if it met the requirements of section 403 (i) (3), or whether this sec-

tion should be construed to apply only to a contract or subcontract for the product of a mine, as respondent urges.

Petitioner's next contention is that, inasmuch as the War Department determined in its administration of the Renegotiation Act that contractors are entitled to a rental allowance based on the 1938 Schedule of Average Ownership Expenses compiled by the Associated General Contractors of America, Inc., and issued its instructions to such effect, it is entitled, for the purpose of renegotiation, to a cost allowance for the use of owned equipment, computed according to such schedule.

In support of its contention, petitioner introduced in evidence, as its Exhibit 1, a mimeographed sheet issued by the office of the division engineer of the War Department at Dallas, Texas. This sheet purports to contain "Instructions for preparation of PAS–CD Form No. 6." PAS–CD Form No. 6 was not introduced in evidence. Petitioner relies upon instruction on item 2D (2) and note 1 contained on the instruction sheet [3] as an interpretation placed on the statute by the administrative agency charged with its enforcement which authorizes it to substitute for the actual costs incurred in the use of equipment which it owned and used in connection with its renegotiable business a rental allowance computed in accordance with the 1938 A. G. C. schedule, which is in evidence. Thus petitioner hopes to secure a decrease of $89,110.59 in the profits realized on its renegotiable business.

At the time the petitioner's counsel offered "Ex. 1" in evidence, the presiding judge stated that he had considerable doubt as to its relevancy, but admitted it in evidence out of an abundance of caution. All it purports to do is to instruct contractors how to fill out a certain form which is not in evidence. Apparently this form called for certain information to assist the division engineer of the War Department in computing costs on a specific "job," as the words "this job" are used repeatedly in the instruction sheet. We are unable to see any justification for the petitioner's contention that the instruction with reference to item 2D (2) and the language used in note 1 constitute an interpretation placed on the statute by an administrative agency charged with its enforcement which is binding upon this Court. The Renegotiation Act provides that each proceeding before this Court be treated as a proceeding *de novo*. We are not concerned, therefore, with what the respondent did or did not consider to be an item of cost in connection with his determination. Petitioner's actual

---

[3] ITEM 2D (2). Attach schedule showing make, cost, age, and time used on this job of each piece of equipment. Compute rental on the basis of "Expense per Working Month—Dollars," according to A. G. C. Schedule of Average Ownership Expenses, 1938 Edition.

NOTE: 1. Rentals charged for use of your previously owned equipment as entered in Item 2D (2) cover depreciation, overhauling, major repairs and painting, interest, taxes and insurance. *Do not include elsewhere in your job costs any duplication of these items.*

costs and expenses have been stipulated. Unless they are unreasonable, the statute contemplates that they be used in the computation of petitioner's excessive profits. The petitioner's claim that it be allowed as an item of expense or cost on equipment which it owned a rental allowance of $126,801.50, computed according to the A. G. C. schedule, is denied.

The questions heretofore decided dispose of the only issues raised by petitioner in its petition, and not thereafter waived or abandoned. It follows, therefore, that petitioner has not proved that the respondent's original determination that it had excessive profits of $245,000 for 1942 is erroneous. At the hearing the respondent filed an amendment to his answer asking that petitioner's profits be redetermined to be excessive to the extent of $270,000, thus increasing his original determination in the amount of $25,000. The burden was on the respondent to justify his claim for this increase.

In *Stein Brothers Manufacturing Co.* v. *Secretary of War*, 7 T. C. 863, this Court said:

* * * Congress, in section 403 (c) (3), indicated some guides to be used. Factors deemed relevant were already known by Congress to be in use in voluntary renegotiations when the act here in question was enacted. The Secretaries directed the renegotiating authorities to use those same factors and their use as to subsequent years was later required by an amendment to the Renegotiation Act. See section 403 (a) (4) (A) as provided in section 701 of the Revenue Act of 1943. They are the factors which any reasonable person would naturally use in determining the amount of excessive profits. * * * Those factors are as follows:

(i) efficiency of contractor, with particular regard to attainment of quantity and quality production, reduction of costs and economy in the use of materials, facilities, and manpower;

(ii) reasonableness of costs and profits, with particular regard to volume of production, normal prewar earnings, and comparison of war and peacetime products;

(iii) amount and source of public and private capital employed and net worth;

(iv) extent of risk assumed, including the risk incident to reasonable pricing policies;

(v) nature and extent of contribution to the war effort, including inventive and developmental contribution and cooperation with the Government and other contractors in supplying technical assistance;

(vi) character of business, including complexity of manufacturing technique, character and extent of subcontracting, and rate of turnover;

(vii) such other factors the consideration of which the public interest and fair and equitable dealing may require, which factors shall be published in the regulations of the Board from time to time as adopted.

The evidence introduced in the instant proceeding in the form of a stipulation and otherwise does not enable us to consider these various factors. Evidence which would enable such consideration was apparently not submitted by the petitioner because its principal contention was that it had no excessive profits because the costs, which

it urged the statute allowed, were in excess of its income from its contracts with the War Department. In attempting to carry his burden of proving that petitioner's excessive profits amounted to $270,000 rather than $245,000 the respondent did not fill in the omissions. At the hearing he presented two witnesses who testified as experts. These witnesses were given hypothetical questions containing a fair résumé of stipulated and proven facts, and asked what in their opinion a fair and reasonable profit would be for the petitioner on its 1942 business subject to renegotiation, before Federal income taxes. The first witness, an investment counselor, testified that in his opinion a fair profit would be $68,000. This, according to the witness, put the industry in line with what the construction industry as a whole earned in 1942 according to a publication of the Treasury Department, Bureau of Internal Revenue, entitled "Statistics of Income." The second witness, a member of a consulting engineering firm, who had had considerable experience with various types of paving in both Texas and China, testified in answer to the same question that in his opinion a fair profit would be $67,000. He stated that his estimate of reasonable profit was based on cost factors only.

This opinion testimony does not convince us that petitioner's excessive profits for the year 1942 were more than the amount originally determined by the respondent. Neither of the witnesses had any personal knowledge of petitioner's operations or the difficulties it experienced and surmounted in connection with the execution of the Camp Hood contracts. In the questions presented to them they were not advised as to the efficiency of petitioner "with particular regard to attainment of quantity and quality production, reduction of costs and economy in the use of materials, facilities and manpower," as to the reasonableness of its costs, as to the amount and source of public and private capital employed, or as to the extent of risk assumed by the petitioner. The failure to incorporate facts pertaining to these factors in the assumed facts set forth in the hypothetical questions submitted to the expert witnesses, because there was no basis in the evidence therefor, materially detracts from the value of their estimates of what would be a fair and reasonable profit for petitioner on its renegotiable business for 1942. The respondent's claim for an increase in the amount of excessive profits is bottomed on the testimony of these two witnesses. This testimony does not convince us that the amount of the petitioner's excessive profits was in excess of $245,000. We have therefore found as a fact that the petitioner during the year 1942 realized from sales subject to renegotiation excessive profits in the amount of $245,000.

Reviewed by the Court.

*An order will be issued in accordance herewith.*