MICHIGAN CHEMICAL CORPORATION, PETITIONER *v.* RENEGOTIATION BOARD, RESPONDENT

Docket No. 1025–R.   Filed February 19, 1968.

*Donald D. MacFarlane, Hudson Mead,* and *Thomas J. Lynch,* for the petitioner.
*Irwin Goldbloom,* for the respondent.

OPINION

The sole issue for determination in this case is whether petitioners contract with the AEC to provide yttrium oxide to that agency, such oxide to be derived from a raw material supplied by the AEC, is entitled to exemption under section 106 (a) (3) of the Renegotiation Act of 1951, as amended.[1] The resolution of this issue hinges on the interpretation of the language "contract * * * for the product of a mine" as it is used in section 106 (a) (3).

Briefly stated, the facts that gave rise to this litigation are as follows: Petitioner is a manufacturer of chemicals. In 1956, petitioner entered into a contract with the AEC under which petitioner was to process yttrium oxide from certain concentrates supplied by the AEC.[2] In 1957 petitioner had receipts of $2,440,041 and a profit of $904,457 under the above contract. Subsequently, in 1961, the Renegotiation Board determined that $250,000 of this profit represented "excessive profits" as that term is defined in the Renegotiation Act of 1951. It is this action of the Board that petitioner is challenging in this proceeding.

Petitioner's argument is that since the Board itself has decided that yttrium oxide is an exempt raw material,[3] their contract with the

---

[1] 50 U.S.C. App. sec. 1216. Exemptions—(a) Mandatory exemptions
The provisions of this title * .* * [Renegotiation of Contracts] shall not apply to—

*      *      *      *      *      *      *

(3) any contract or subcontract for the product of a mine, oil or gas well, or other mineral or natural deposit, or timber, which has not been processed, refined, or treated beyond the first form or state suitable for industrial use ; * * *

[2] Later modifications of the original contract made provision for petitioner supplying the concentrates itself. However, it is stipulated that the Renegotiation Board removed from its determination of excessive profit, the sales and related costs and expenses with respect to yttrium oxide produced by petitioner as to which petitioner furnished the concentrates. Thus, the issue in this proceeding relates solely to petitioner's processing of yttrium oxide from concentrates supplied by the AEC.

[3] Renegotiation Board Regs. sec. 1453.2 (b) (3).
List of exempt raw materials.—(i) The Board has determined that the following products are exempt under section 106 (a) (3) of the [Renegotiation] Act * * * when they represent products of a mine * * * or other mineral or natural deposit * * * which have not been processed, refined or treated beyond the first form or state suitable for industrial use * * *
(ii) * * *

RAW MATERIALS EXEMPTION LIST

*      *      *      *      *      *      *

Yttrium ores and concentrates ; yttrium oxide. * * *

AEC is a contract for an exempt raw material which is exempted from renegotiation under section 106(a)(3), and that any attempt by the Board to read in the requirement of a "sale" is unwarranted. Respondent, on the other hand, citing the legislative history of the section and a case decided by this Court, argues, that a "sale" of the exempt raw material is a prerequisite to the exemption contained in section 106(a)(3). We agree with respondent.

Respondent relies, in part, on *Morgan Construction Co.* v. *Secretary of War*, 11 T.C. 764 (1948). This was a case concerning the applicability of the cost allowance provision of the Renegotiation Act of 1943.[4] The rationale of this provision is that since producers whose processing of raw material does not bring the raw material beyond the first form or state suitable for industrial use are exempt from renegotiation, an integrated producer who processes a raw material to and beyond such first form or state should be allowed a cost allowance substantially equivalent to the amount which would have been realized by him if he had sold such production in its first form or state. As stated by the Court, the purpose of the cost allowance provision,

was to place producers of mineral products who processed, refined or treated such products to and beyond the first form or state suitable for industrial use in a position comparable to *producers who sold their products* at the exempt stage. * * * [Emphasis added.]

The Court then went on to hold that in order to be eligible for a *cost allowance* the producer must have a property interest in the mineral product that it could have sold at the exempt stage. The instant case, in effect, now presents the issue of whether in order to be eligible for the *statutory exemption*, the producer must have a property interest in the mineral product that it could have sold at the exempt stage.

We are of the opinion that the decision of this Court in the *Morgan* case logically requires that such a property interest be held to be necessary in order that a producer be eligible for the exemption under section 106(a)(3) of the Renegotiation Act of 1951. This is evidenced by the incongruous result if we decide in the present case that no property interest in the mineral is required in order to qualify for the exemption. To so hold would mean that this Court, in attempting to maintain the equality of treatment which Congress intended between the integrated producer and the producer who does not process beyond

---

[4] Sec. 403(i) * * * [Renegotiation Act of 1943]

(3) In the case of a contractor or subcontractor who produces or acquires the product of a mine, oil or gas well, or other mineral or natural deposit, or timber, and processes, refines, or treats such a product to and beyond the first form or state suitable for industrial use * * * the Board shall prescribe such regulations as may be necessary to give such contractor or subcontractor a cost allowance substantially equivalent to the amount which would have been realized by such contractor or subcontractor if he had sold such product at such first form or state. * * *

[Sec. 106(b) is the comparable provision in the 1951 Act.]

the first state, has, instead, created a difference in treatment between the two. The present case can be used to illustrate this result.

If we decide that the producer does not need a property interest in the mineral that could be sold at the exempt stage in order to be eligible for exemption, it follows that the contract for yttrium oxide in this case is exempt from renegotiation. If, however, petitioner in this case processed or treated the yttrium oxide one step further, so that it no longer was an exempt raw material enumerated in the Renegotiation Board Regulations, then on the authority of the *Morgan* case, the petitioner would not be entitled to a cost allowance. But the purpose of the cost allowance was to put the integrated producer in a position comparable to the producer who claimed the exemption at the first form or state, where the only difference between the two was that the integrated producer took the raw material to and beyond the first state. Thus, since we have previously decided that a property interest is required in order to be eligible for cost allowance, the same property interest should be required in order to be eligible for the exemption.

Our conclusion drawn inferentially from the *Morgan* case is substantiated by certain language used by this Court therein and by the Senate committee that considered the Renegotiation Act of 1951. In *Morgan*, this Court, in discussing the cost allowance described producers eligible for the exemption as "producers who *sold* their products at the exempt state." (Emphasis added.) The Senate report on the Renegotiation Act of 1951 expressed the same idea in the following language: "In order to place an integrated producer * * * on a parity with a producer who *sells* at the last exempted form or state * * * [a cost allowance will be allowed]." (Emphasis added.)[5] Thus, both this Court and the Senate assumed that the producer who qualified for the exemption could sell the exempt raw material, i.e., that it had a salable property interest therein.

Our result is further substantiated by the legislative history of the raw materials exemption. The various congressional reports and hearings on both the Renegotiation Acts of 1942 and 1951[6] indicate that the following various considerations were involved in the adoption of the raw materials exemption: The depleting- and vanishing-asset aspect of mining operations; the fact that renegotiation might hamper exploratory and development activities which might endanger

---

[5] S. Rept. No. 92, to accompany H.R. 1724 (Pub. L. 9), 82d Cong., 1st Sess., p. 4 (1951).

[6] Sec. 403(i)(1)(ii) of the 1942 Act is identical to sec. 106(a)(3) of the 1951 Act. The congressional reports and hearings include the following: Renegotiation of Contracts, Hearings before a subcommittee of the Senate Committee on Finance on sec. 403 of Pub. L. No. 528, 77th Cong., 2d Sess., p. 128 (1942); Renegotiation of Contracts, Hearings before the House Committee on Ways and Means on H.R. 9246, 81st Cong., 2d Sess., pp. 19, 122, 145, 181, 221 (1950); S. Rept. No. 92, *supra.*

future supplies of raw materials; that renegotiation might discourage the flow of venture capital into mining operations; and that it would be difficult to segregate profits for renegotiation purposes which would not constitute a return of capital to the Government. It is clear that none of these considerations have any application to the situation where the party contracting with the Government merely performs a processing operation on a raw material which the Government furnishes to it, and in which it has no property interest, and we do not think Congress intended the raw materials exemption to apply to such a situation.

We therefore hold that in order to be eligible for the statutory exemption under section 106(a)(3), the contractor must have a salable property interest in the mineral product at the exempt stage.

The question remaining for decision is whether the petitioner in the instant case had the requisite property interest in the yttrium oxide it processed for the Government. It is our opinion that it did not have such a property interest.

In order for the petitioner to have had a property interest in the yttrium oxide, there must have been at some point a transfer of title, from the Government to it, to the concentrate from which the yttrium oxide was processed. However, we find no evidence of such a transfer in the contract between the parties, but rather, an express provision retaining title to both in-process and inventory concentrates in the Government. And this express provision, we think also negates the application in this case of any legal theory, such as the doctrine of specification,[7] which might operate, in the absence of any intent by the parties, to shift title to the concentrates to the petitioner. Here, the parties have specifically agreed that title to the concentrate while it is being processed will remain in the Government, so that it is impossible to maintain that the title shifted during the processing to the petitioner by means of any such property law doctrine. Furthermore, even if the contract did not contain the express provision regarding title to the concentrates, we do not think the change brought about by petitioner's processing operation is of such a character as to fall within the ambit of the doctrine of specification.[8] So far as the record

---

[7] Under the doctrine of specification, when there has been change or transmutation of the subject matter into a different species so that the thing cannot be restored to its former state by individual action, the title to it passes from the owner to the person who wrought the change. 1 Am. Jur. 2d, sec. 2.

[8] Right by "specification" can only be acquired when the property of another person, which has been used by the operator innocently, has been converted by him into something specifically different in the inherent and characteristic qualities which identify it. Such is the conversion of corn into meal, of grapes into wine, etc. Here, although the meal possesses no quality which the corn did not, yet it not only does not possess all the same qualities, but there is a difference in the name, the character, the solidity, and every attribute which distinguishes one species from another. *Lampton's Executors* v. *Preston's Executors,* 24 Ky. 454, 19 Am. Dec. 104 (1829).

shows, the finished product was the same as the concentrates in name, character, solidity, and every other physical attribute which distinguishes one from the other with the exception of purity.

It is our conclusion that the petitioner merely performed a processing operation on a raw material furnished by the AEC and at no time had a property interest in that raw material that it could sell.[9] Accordingly, we hold that petitioner was not entitled to the exemption provided under section 106(a)(3), and that therefore petitioner realized excessive profits in the year 1957 in the amount of $250,000.

*An order will be entered in accordance herewith.*

---

[9] Art. XIII, par. 5, of the contract between petitioner and the AEC, on the surface, appears to contradict our conclusion in this regard. That paragraph provides that:

> 5. If this contract is terminated * * * [for default], the Government, in addition to any other rights provided in this Article, may require the Contractor to transfer title and deliver to the Government * * * [yttrium oxide] in accordance with the contract specifications * * *

However, this provision stems directly from the standard "default" clause used in all Government fixed price supply contracts (see FPR 1-8.707(d)), and we do not think its use in the contract involved in this case indicates any agreement between the parties that the petitioner was to have title to the completed yttrium oxide.