MICHIGAN CHEMICAL CORPORA-
TION, Appellant,

v.

The RENEGOTIATION BOARD,
Appellee.

No. 18917.

United States Court of Appeals
Sixth Circuit.

June 30, 1969.

Samuel H. Horne, Washington, D. C., for appellant; Donald D. MacFarlane, Hudson Mead, Detroit, Mich., Charles W. Davis, Chicago, Ill., on brief; Tolleson, Burgess & Mead, Detroit, Mich., Hopkins, Sutter, Owen, Mulroy, Wentz & Davis, Chicago, Ill., of counsel.

Irwin Goldbloom, Atty., Dept. of Justice, Washington, D. C., for appellee; Edwin L. Weisl, Jr., Asst. Atty. Gen., Morton Hollander, Atty., Dept. of Justice, Washington, D. C., on brief.

Before WEICK, Chief Judge, and PHILLIPS and CELEBREZZE, Circuit Judges.

PHILLIPS, Circuit Judge.

This appeal is from the decision of the Tax Court of the United States reported at 49 T.C. 488. Reference is made to the opinion of the Tax Court for a detailed recitation of the facts, which will not be repeated here except to the extent necessary for purposes of this opinion. We affirm.

Late in 1955 nuclear research groups discovered that yttrium oxide possessed certain properties which might make it desirable as a reaction material. Appellant (Michigan Chemical) entered into a contract on May 10, 1956, with the Atomic Energy Commission (AEC) to process yttrium oxide from concentrates containing certain rare earth oxides and yttrium oxide. The concentrates were owned by the AEC and supplied by AEC to Michigan Chemical. Title to the concentrates, the finished product and the residues of the process was at all times in AEC. Under the provisions of the contract AEC was to supply concentrates containing 60 to 75 per cent yttrium oxide and Michigan Chemical was to

process it to 99.9 percent yttrium oxide and return it to AEC.[1]

In 1957 Michigan Chemical had income of $2,440,041 and a profit of $904,457, representing 36.9 per cent of income from its processing of yttrium oxide from concentrates furnished by AEC. After the Board had determined excess profits of $250,000, Michigan Chemical still had profits of $664,457 for the year from processing concentrates furnished and owned by AEC.

The Renegotiation Board (the Board) determined that, during the fiscal year 1957, $250,000 of Michigan Chemical profits represented excess profits as that term is defined by the Renegotiation Act of 1951. The Tax Court affirmed the determination of the Board in a proceeding authorized by 50 U.S.C.App. § 1218.

The sole question on this appeal is whether the contract was exempt from renegotiation under the mandatory exemption provisions of § 106(a) (3) of the Renegotiation Act, 50 U.S.C.App. § 1216:

"Exemptions—(a) Mandatory exemptions

"The provisions of this title [sections 1211–1223 of this Appendix] shall not apply to—

\* \* \* \* \* \*

"(3) any contract or subcontract for the product of a mine, oil or gas well, or other mineral or natural deposit, or timber, which has not been processed, refined, or treated beyond the first form or state suitable for industrial use; or \* \* \* ".

Stated differently the question is whether the above-quoted statutory exemption applies to a contractor who performs a chemical process on materials furnished by AEC.

The provisions of the Renegotiation Act of 1951 expressly apply to contracts with AEC. 50 U.S.C.App. §§ 1212(a), 1213(a). If the above-quoted exemptions provision is not applicable, the contract of Michigan Chemical with AEC is specifically subject to renegotiation.

The statutory exemption involved here was contained in the Renegotiation Act of 1942, 50 U.S.C.App. § 1191. The Renegotiation Act had expired before the commencement of the Korean War in 1950. In August 1950, during the Second Session of the 81st Congress, hearings were conducted before the House Committee on Ways and Means on a proposed new renegotiation bill, H.R. 9256. This bill, as introduced, did not contain a raw materials exemption. At the committee hearings several witnesses urged the inclusion of such an exemption. H.R. 9256 was not enacted during the 81st Congress, but a similar bill was introduced and passed by the House as H.R. 1724, 82nd Congress, 1st Session, without additional hearings before the House Ways and Means Committee. The bill as passed by the House included an exemption of raw materials at the mine door but did not extend the exemption through the first form or state suitable for industrial use. The Senate Finance Committee conducted hearings on H.R. 1724 on January 31 and February 2, 1951. The Senate expanded the exemption to make it identical with the provisions contained in the 1942 Renegotiation Act. The bill as enacted into law contained the language of the 1942 Act. Thus the raw materials exemption of the 1942 and 1951 Renegotiation Acts are identical.

The various congressional reports and hearings on both the Renegotiation Acts of 1942 and 1951 are cited in footnote 6 of the opinion of the Tax Court 49 T.C. at 493. We agree with the Tax Court that, as reflected by the legislative history, Congress gave consideration to

1. A subsequent amendment to the contract permitted Michigan Chemical to obtain concentrates from other sources. AEC agreed to pay $12 more per pound for the refined 99.9 per cent yttrium oxide processed from concentrates owned by Michigan Chemical than from concentrates owned and supplied by AEC. There was no renegotiation of that part of the supplemental contract involving concentrates other than those owned and supplied by AEC.

the following in enacting the raw materials exemption:

"The depleting—and vanishing-asset aspect of mining operations; the fact that renegotiation might hamper exploratory and development activities which might endanger future supplies of raw materials; that renegotiation might discourage the flow of venture capital into mining operations; and that it would be difficult to segregate profits for renegotiation purposes which would not constitute a return of capital to the Government." 49 T.C. at 493–494.

A study of the legislative history convinces us that the purpose of Congress in enacting the exemption has no application to a contract where a sale is not involved and where the contracting party never owns the materials but merely performs a processing operation on raw materials owned and furnished by the Government.

The Senate Finance Committee explained the effect of the exemption in its report as follows:

"Your committee has adopted exemptions relating to contracts and subcontracts for agricultural commodities and for products of mines, oil and gas wells, and other mineral and natural deposits and timber, which are identical with the exemptions contained in the renegotiation statute in effect during World War II.

\*    \*    \*    \*    \*    \*

"Section 106(a) (3) exempts from renegotiation any contract or subcontract for the product of a mine, oil or gas well or other material or natural deposit, or timber, which has not been processed, refined or treated beyond the first form or state suitable for industrial use. It is intended by this exemption to exempt all products which would have been exempt under the identical exemption contained in the renegotiation statute in effect during World War II. Thus, this exemption applies to contracts or sub-

contracts for the *sale* of pig iron, which is the first form or state of iron ore which is suitable for industrial use \*  \*  \* ." S.Rep. No. 92, 82nd Cong., 1st Sess., p. 4 (1951). (Emphasis supplied.) U.S. Code Cong. & Admin. News, p. 1342.

The remarks on the floor of the Senate by Senator George, Chairman of the Senate Finance Committee, lend support to the view that a sale of a product of a mine is required in order for a transaction to come within the scope of the exemption. Senator George said:

"Any contract or subcontract for the product of a mine, oil, or gas well, or other mineral or natural deposit or timber, which has not been processed, refined, or treated beyond the first form or state suitable for industrial use is also exempt from renegotiation under the bill as amended by the Senate Finance Committee. An illustration of this exemption is that it would apply to contracts or subcontracts for the *sale* of pig iron, which is the first form or state of iron ore suitable for industrial use. \*  \*  \* " 97 Cong.Rec. 1325. (Emphasis supplied.)

The legislative history and the language of the statute convince us that the exemption primarily was designed as a benefit to the mining and extractive industries as distinct from the manufacturing industries. At the hearings on the 1942 Renegotiation Act, H.R. 7878, 77th Cong., 2d Sess., Senator Vandenberg said:

"Senator Vandenberg. It seems to me that there is a reason for treating raw materials differently than finished products particularly in metals and ores. The raw material is recognized by this Committee as being a product which is not replaced, and going back to copper, it is mined once and that is all there is to it, and we recognize the depletion involved, and I don't believe that technical consideration ought to be submitted to renegotiation.

* * * * * *

"I can see the necessity for a little latitude at that point, but I can't see any justice in submitting vanishing assets to a renegotiator who cannot possibly be competently equipped to deal with the vanishing asset value." Hearings Before a Subcommittee of the Committee on Finance, United States Senate, 77th Cong., 2d Sess., Sept. 29–30, 1942, Renegotiation of Contracts, p. 128.

Michigan Chemical urges that the exemption applies regardless of whether a sale is involved. This interpretation is contrary to the above-quoted comments of Senators George and Vandenburg and the legislative history of the exemption.

It is further urged by Michigan Chemical that the purpose of the statute was for administrative convenience in determining whether a particular product was exempt. The interpretation of the Board and Tax Court in the present case is consistent with this view. We cannot conceive of a clearer line of demarcation for administrative convenience than whether the contractor owns and sells the material or merely processes it.

Affirmed.